*In re* MARRIAGE OF DANIEL M. WENC, Petitioner and Counterrespondent-Appellant, and ELIZABETH F. WENC, n/k/a Elizabeth F. Fleming, Respondent and Counterpetitioner-Appellee.

Second District   No. 2—96—1509

Opinion filed January 13, 1998.—Rehearing denied February 9, 1998.

Timothy B. Newitt, of Johnson, Westra, Broecker, Whittaker & Newitt, P.C., of Carol Stream, for appellant.

Robin R. Miller, of DaRosa & Miller, of Wheaton, for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

Petitioner and counterrespondent, Daniel Wenc, and respondent and counterpetitioner, Elizabeth Wenc, n/k/a Elizabeth Fleming, married in 1961 and divorced in 1983. After petitioner retired, respondent sued to determine her share of his pension benefits. Petitioner appeals the ruling on respondent's suit, asserting that the trial court erred in interpreting the settlement agreement incorporated into the divorce judgment. We reverse the judgment and

remand for further proceedings. We hold that (1) the trial court erred in applying *In re Marriage of Hunt*, 78 Ill. App. 3d 653 (1979), without fully considering the language of the settlement agreement; and (2) the agreement is ambiguous, necessitating an evidentiary hearing for a proper determination of the parties' intent.

At the time of the divorce, petitioner was 43 years old and respondent was 45. Since August 1, 1961, petitioner taught school full time, contributing to the Teachers' Retirement System of the State of Illinois (Retirement System) (see 40 ILCS 5/16—101 *et seq.* (West 1994)). Paragraph 5 of the settlement agreement stated, as pertinent here:

> "DANIEL's represented adjusted contribution to the Teacher Retirement Fund is *** $27,000. In addition thereto, DANIEL's estimated pension, assuming a retirement age of 55, is in the approximate sum of $677.00 per month, with an additional annuity of $1,212.00 per month. ELIZABETH shall be entitled to receive 30% of all of DANIEL'S vested, non-vested and/or accrued pension/retirement benefits accumulated as of the date hereof [*i.e.*, the date of the dissolution] at such time in the future when and if said benefits are paid to DANIEL. All benefits accrued or accumulated by DANIEL hereafter shall be his sole and exclusive property."

At the end of the 1993-94 school year, petitioner retired. In June 1994, about two months before his fifty-fourth birthday, he started drawing his Retirement System pension. In April 1995, respondent brought this action, asking the court to hold petitioner in contempt of his obligation under paragraph 5 of the agreement. As pertinent here, respondent alleged that, since June 8, 1994, petitioner received $4,135.49 monthly in gross pension benefits but tendered respondent only $363.60 monthly, far short of her 30% share.

Petitioner replied that his monthly payments followed the plain language of paragraph 5 by giving respondent 30% of the monthly benefit he had earned as of the dissolution. Petitioner relied in part on a letter from a legal assistant to the Teachers' Retirement System. The letter stated that, based on petitioner's years of creditable service and average salary from August 1, 1961, through November 30, 1983, and assuming he started drawing benefits on August 15, 1995 (when he turned 55), he would receive $709.93 monthly. Petitioner maintained that paragraph 5 entitled respondent to 30% of this sum, with adjustments for the temporarily lower benefit levels resulting from petitioner's early retirement. According to petitioner, his monthly payments to respondent were good-faith efforts to adhere to the settlement.

The matter proceeded to a hearing. Respondent called Vito Loisi, a certified public accountant, who opined that petitioner's method of calculating respondent's share of his monthly pension did not embody the 1983 settlement agreement. Loisi described two alternative methods he used to arrive at a proper allocation.

The first method was based on *In re Marriage of Hunt*, 78 Ill. App. 3d 653 (1979), where the appellate court explained that a court should calculate the marital portion of a monthly pension benefit by dividing the total years of credited service during the marriage by the total years of credited service and multiplying this fraction by the monthly benefit. *Hunt*, 78 Ill. App. 3d at 663; see also *In re Marriage of Alshouse*, 255 Ill. App. 3d 960, 962-63 (1994). Assuming (as is not in dispute) that petitioner had 21 years of credited service during the marriage and 32 years total credited service, Loisi applied the *Hunt* algorithm to petitioner's gross monthly benefit of $4,135.49. Adjusting for the contribution that enabled petitioner to retire early, Loisi found that, for the first 24 months, the marital portion was $2,073.58 monthly ($21/32$ of the net monthly benefit after the contribution) and respondent's 30% share was thus $622.07 monthly. After the first two years, respondent would receive $814.17 monthly—30% of the marital $21/32$ of the gross benefit.

Loisi suggested alternatively that the $709.93 sum could be adjusted for growth based on earnings or inflation taking place between the divorce and the payout. Using a "conservative" annual growth rate of 6%, Loisi calculated respondent's share of the monthly benefit at $431.84 for the first 24 months and $623.94 thereafter. Under either method, respondent's share would increase, along with petitioner's payment, after his sixty-first birthday.

Loisi preferred using the *Hunt*-based method to determine the marital part of the pension benefits, as the years of service before the dissolution helped to increase the benefits that accrued afterward. According to Loisi, petitioner's calculation was unacceptable because it took the projected benefit amount as of the dissolution date and "froze" that amount as of that earlier date. Loisi agreed with the Retirement System's letter to petitioner that, if petitioner stopped working the day of the dissolution, he would later receive $709.93 monthly. However, Loisi noted that petitioner did not adjust for the growth of this sum between 1983 and petitioner's retirement much later.

The trial court refused to find petitioner in contempt (a holding not at issue here) but otherwise sided with respondent. The court applied the *Hunt* formula, explaining that the language of paragraph 5 showed that the parties drafted it with *Hunt* in mind. Thus, they did

not intend that respondent's share of the benefit be "frozen" as of the date of the divorce. Under *Hunt*, respondent was entitled to $814.17 of the $4,135.49 monthly benefit; for the first 24 months, this share would be $622.07, the same proportion of the lower initial benefit. The court denied petitioner's motion to reconsider. He appeals.

Petitioner argues that the trial court awarded respondent an excessive share of his pension benefit. He asserts that, under the plain language of paragraph 5, respondent was entitled only to what he had been paying her—30% of what he would have received each month had he stopped working as of the dissolution judgment in November 1983. According to petitioner, the trial court imported the *Hunt* formula into an agreement that plainly declined to follow *Hunt*.

Respondent counters that the trial court's decision is consistent with the language of paragraph 5 and rightly accounts for the greater importance of early contributions—here, those made during the marriage and not afterward—to the eventual pension benefit ultimately paid.

■ Interpreting a marital settlement agreement is a matter of contract construction; the court seeks to effectuate the parties' intent. *In re Marriage of Agustsson*, 223 Ill. App. 3d 510, 518 (1992). Ordinarily, the best guide to the parties' intent is the language they used. *In re Marriage of Frain*, 258 Ill. App. 3d 475, 478 (1994). When contract terminology is unambiguous, it must be given its plain and ordinary meaning. *Frain*, 258 Ill. App. 3d at 478. However, where the language is ambiguous, the trial court may receive parol evidence to decide what the parties intended. *Pepper Construction Co. v. Transcontinental Insurance Co.*, 285 Ill. App. 3d 573, 576 (1996). Whether an agreement is ambiguous is a question of law. *Pepper Construction Co.*, 285 Ill. App. 3d at 575-76.

We must note that much of paragraph 5's meaning is unclear from the record. Nowhere does anyone identify or explain the "additional annuity of $1,212.00 per month" due petitioner on his retirement. Also, neither the trial court nor the parties attached any significance to the opening recital of petitioner's total contributions to date. Under the Retirement System statute, petitioner's benefits depend not on the amount of contributions but on a function of a multiplier (related to the pensioner's years of service) and the pensioner's final average salary. Although the statute allows for benefits based on accumulated contributions at the time of retirement, if that amount is the greater of the two, the parties appear to agree that at all pertinent times petitioner's benefit level would not have been based on this alternate methodology. See 40 ILCS 5/16—133(a) (West 1994); *In re Marriage of Wisniewski*, 286 Ill. App. 3d 236,

238 (1997). We shall not try to explain these terms, although on remand the parties may attempt to do so if it sheds light on the proper interpretation of the terminology directly at issue.

We hold first that the trial court erred in finding that paragraph 5 unambiguously shows that the parties intended to base the division of benefits on the *Hunt* formula. At least without extrinsic evidence of the parties' intent, the similarities between this case and *Hunt* are too limited to support an inference that the division of the pension should be similar.

■ A dissolution judgment may value and divide marital property in a spouse's pension plan by using the "immediate offset" approach or the "reserved jurisdiction" approach. See *Wisniewski*, 286 Ill. App. 3d at 240-41; *Hunt*, 78 Ill. App. 3d at 663. Under the immediate offset approach, the court uses actuarial evidence to assign a present value to the pension interest at the time of dissolution. Next, the court determines the marital portion of that interest by multiplying it by a fraction representing the proportion of marital years in which benefits were accumulated to the total years in which benefits were accumulated. The court awards the pension interest to the pensioner spouse and gives the nonpensioner sufficient other marital property to offset her marital share in the interest. *In re Marriage of Burkhart*, 267 Ill. App. 3d 761, 766 (1994); *Hunt*, 78 Ill. App. 3d at 663.

Under the reserved jurisdiction approach, the trial court awards each spouse an appropriate share of the pension "to be paid 'if, as, and when' the pension becomes payable." *Hunt*, 78 Ill. App. 3d at 663, quoting M. Kalcheim, *Marital Property, Tax Ramifications, and Maintenance: Practice Under the Illinois Marriage and Dissolution of Marriage Act—A Comparative Study*, 66 Ill. B.J. 324, 335 (1978), and citing *In re Marriage of Brown*, 15 Cal. 3d 838, 842-43, 544 P.2d 561, 563, 126 Cal. Rptr. 633, 635 (1976); see *Burkhart*, 267 Ill. App. 3d at 766. However, as petitioner notes, that the court reserves payment until long after the dissolution judgment does not mean it reserves a decision on how to calculate the eventual payment. Depending on how the court exercises its discretion or what the parties have agreed, the dissolution judgment itself may dictate how the pension benefits will be allocated; however, the court may reserve this decision until the benefits are paid. *Wisniewski*, 286 Ill. App. 3d at 241; see, *e.g., In re Marriage of Alshouse*, 255 Ill. App. 3d 960, 961-63 (1994) (marital settlement agreement left determination of precise formula until proceeding after pensioner spouse retired).

In *Hunt*, where no settlement agreement was involved, the appellate court set out rules to guide trial courts in the exercise of their discretion in dividing marital property. The court explained that the

marital portion of the pension interest was the overall interest multiplied by a fraction representing the length of time during the marriage in which the pension accumulated divided by the total time in which the pension accumulated. *Hunt*, 78 Ill. App. 3d at 663. Here, the trial court applied the *Hunt* rule to the settlement agreement, giving respondent 30% of that part of the payments which, under the *Hunt* rule, were marital property. However, because the parties signed an agreement covering this very subject, the court's decision makes sense only if the agreement shows the parties intended to divide the benefits this way. Of course, the parties were also free to allocate the benefits by some other formula. Therefore, as the trial court recognized, applying *Hunt* directly makes sense only if paragraph 5 so dictates.

In finding that paragraph 5 does embody *Hunt*, the trial court focused on the parties' use of the type of "if, as, and when" language *Hunt* emphasized. However, we agree with petitioner that the use of this kind of language signifies only that the parties chose the reserved jurisdiction approach over the immediate offset approach. These "magic words" imply that the pension will be divided when it becomes payable rather than at the time of the dissolution, but they say nothing about *how* the payments will be divided. Thus, the proper construction of paragraph 5 requires more inquiry into what the parties meant by the language they used.

We proceed to examine that language to determine whether it is ambiguous. If it is not, it must be applied as written; if it is, extrinsic evidence of the parties' intent will be necessary. (Although the hearing included expert testimony, there was no evidence of the intent behind the language. At the very least, there was not enough extrinsic evidence for a proper determination of this factual issue.) We hold that the language is ambiguous.

Paragraph 5 is not long, but it is dense with potentially confusing terminology. Aside from the unexplained verbiage we have noted, several phrases are less than crystal clear. The distinctions, if any, among "vested, non-vested, and/or accrued pension benefits" are not spelled out at all in the agreement or precisely in the case law. Thus, merely from the language of paragraph 5, we cannot say for certain what "benefits" petitioner had "accumulated or accrued"—another potentially treacherous phrase—at the time of the divorce judgment. Petitioner's reading of the agreement is straightforward and reasonable enough. However, it is not the only reasonable one.

As the cases demonstrate, the delay between the divorce judgment and the payout period casts into doubt precisely how much of the ultimate pension amount is the base for respondent's 30% share.

This is because cases recognize the time value of money and that pension contributions in the early (marital) years carry more earning weight than those in the later (postdissolution) years. Courts ordinarily compensate the nonpensioner spouse for this fact by using rules that may make the marital portion of the payments appreciably greater than what the pensioner spouse would have received based on his years of employment during the marriage.

*In re Marriage of Blackston*, 258 Ill. App. 3d 401 (1994), illustrates this principle backhandedly, even though the appellate court denied the nonpensioner spouse the recovery she sought. There, the trial court used the reserved jurisdiction approach, ordering the distribution of payments according to the *Hunt* formula. On appeal, the husband argued that this distribution unfairly benefited the wife by rewarding her for postdissolution increases in the value of the husband's pension. On the state of the record, the Appellate Court, Fifth District, agreed. The court rejected the wife's (and the trial court's) assumption that the husband's early earnings carried greater weight than those made in later years "because the earlier dollars have had many more years to grow through accumulation of interest on investment." *Blackston*, 258 Ill. App. 3d at 407. However, the appellate court acknowledged that, in principle, this consideration might be proper; it reversed only because the wife had provided no evidence of the time value of money. *Blackston*, 258 Ill. App. 3d at 407.

In *Wisniewski*, the Appellate Court, First District, agreed that the time value of money is a legitimate factor but disagreed with the fifth district that the nonpensioner spouse needs to introduce evidence of the earning power of early payments in order to obtain a distribution based on the *Hunt* formula. The court reasoned, correctly in our view, that our courts "[have] long recognized the time value of money." *Wisniewski*, 286 Ill. App. 3d at 244.

The application of this insight in *Wisniewski* is significant. Not only did the court hold that the trial court did not abuse its discretion in apportioning benefits according to *Hunt*'s proportional formula, but it also implied that the court would have abused its discretion in *refusing* to account for the greater earning power of early contributions. The husband's argument, which implied otherwise, ignored the "fact *** that contributions in the early years are more valuable to the payor of the plan than are payments in the last years. [The wife] cannot be deprived of the interest earned by marital contributions just because the pension plan does not specifically account for that interest in determining the pension benefit." *Wisniewski*, 286 Ill. App. 3d at 245. Similarly, even though the

multiplier was greater for the later years than for the earlier ones, the court "[could not] say that the years after the marriage were more valuable than the years during the marriage. Because of the time value of money, the opposite would appear to be true, unless contributions were significantly greater in later years." *Wisniewski*, 286 Ill. App. 3d at 245.

Although not by itself dispositive, it is worth noting that the husband's interpretation of the settlement agreement would entitle him to a benefits division so lopsided that it would probably not survive appellate review absent an agreement. This is because, to arrive at this result, the court either would have had to calculate the marital share of the pension benefits in a way inconsistent with *Hunt* or would have had to award respondent a truly tiny portion of the marital share as properly calculated under *Hunt*. The parties were married for about *two-thirds* of the years during which petitioner earned credited service, yet the base figure out of which he suggests the court carve respondent's 30% share is approximately *one-third* of respondent's actual benefit. This disparity is permissible if the parties agreed to it. Yet it is so great—especially given the importance of the marital years of credited service to the size of the eventual benefit—that we are reluctant to conclude that respondent clearly struck such a bargain.

We do not believe that paragraph 5 unambiguously embodies an agreement that "freezes" respondent's share without accounting for the long-recognized time value of money. The agreement speaks of both "vested" pension rights and "non-vested" pension rights, even though there is no dispute that, by 1983, petitioner had served enough years so that his right to collect a pension upon retirement had already "vested." Thus, petitioner's reading of the disputed terminology would require us to ignore as wholly superfluous the parties' deliberate reference to any "non-vested" rights under the Retirement System pension plan. (Aside perhaps from the paragraph's mysterious reference to an additional monthly annuity of $1,212, nothing in the record suggests that the parties contemplated the division of benefits in another plan to which petitioner belonged.) Generally, we will not assume that the parties inserted key contractual language for no reason at all, as a document should be read to give effect to all its provisions. *Roubik v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 285 Ill. App. 3d 217, 220 (1996).

Furthermore, the importance of petitioner's early years of credited service to the eventual payout level suggests that paragraph 5 contains further ambiguities. From the perspective of over a decade after the dissolution—when petitioner's pension rights not only

vested but matured—it is at least debatable what part of his eventual benefits of over $4,000 monthly petitioner "accumulated" as of 1983. That part might be construed to include the amount that the earlier (marital) years added to the eventual sum through compounding. Similarly, what part of his eventual benefits petitioner "accrued or accumulated" after the dissolution is open to some reasonable dispute. Depending on the parties' intent, he *might* be deemed to have accrued or accumulated, through the workings of compound interest, a sizeable amount of the eventual benefit beyond what he would have received had he retired in 1983. These murky matters of interpretation are for the trial court. We cannot accept either the court's view that the agreement unambiguously supports respondent's interpretation or petitioner's assertion that the contract clearly favors his reading. Therefore, we must reverse the judgment and remand this cause so that the court may receive extrinsic evidence on how the parties intended to allocate petitioner's pension benefits.

The judgment of the circuit court of Du Page County is reversed, and the cause is remanded.

Reversed and remanded.

GEIGER, P.J., and THOMAS, J., concur.