NO. 4-09-0605          Filed 3/26/10

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: the Marriage of | ) | Appeal from |
| JEROLD S. CULP, | ) | Circuit Court of |
|     Petitioner-Appellant, | ) | Vermilion County |
|     and | ) | No. 99D56 |
| SUSAN K. CULP, n/k/a SUSAN FOX, | ) | |
|     Respondent-Appellee. | ) | Honorable |
| | ) | Joseph P. Skowronski, |
| | ) | Judge Presiding. |

_____

JUSTICE KNECHT delivered the opinion of the court:

In February 1999, petitioner, Jerold S. Culp (Jerry), filed a petition for the dissolution of his marriage to respondent, Susan K. Culp, n/k/a Susan Fox. As part of their settlement agreement, the parties agreed Jerry's retirement benefits were to be "equally divided as of April 20, 1999, pursuant to a separate [Qualified Illinois Domestic Relations Order (QILDRO)]." Because Jerry was not near retirement at the time of the dissolution, the trial court reserved jurisdiction for the entry of a QILDRO at a later date.

In January 2009, Susan filed a motion for entry of a QILDRO along with a proposed order directing Jerry to sign his consent to the QILDRO. The proposed QILDRO set forth a formula for determining the value of the marital portion of Jerry's pension and dividing it between the parties. After a March 2009 hearing at which Jerry objected to Susan's proposed QILDRO, the trial court entered a written order directing Jerry to sign his consent.

Jerry appeals, arguing the trial court erred in finding Susan's proposed QILDRO conformed to the parties' settlement agreement. We disagree and affirm.

## I. BACKGROUND

The parties married June 7, 1975. In February 1999, Jerry filed for dissolution of marriage. At the time Jerry filed the dissolution petition, he was 43 years old and employed as a master sergeant with the Illinois State Police (ISP).

In June 1999, the trial court entered its dissolution order, reserving unresolved issues for a later date. In August 1999, the court conducted a final hearing in which the parties entered into a settlement agreement on all remaining issues. The agreement provided for the custody, support, education expenses, and visitation of the parties' minor child and distribution of the parties' property. Pertinent to this appeal is the distribution of Jerry's State Employees' Retirement System (SERS) defined-benefit plan pension, which he obtained from his employment with ISP.

The pension's value began to accumulate during the marriage, as Jerry's employment began after the parties married, and was the parties' major marital asset. Article C, paragraph 23, of the settlement agreement states as follows:

> "[Jerry] has certain retirement benefits
> through [SERS] which are valued at
> approximately $84,000 as of April 20, 1999,
> the date of entry of the [j]udgment of

[d]issolution of [m]arriage on grounds.  Said

retirement benefits shall be equally divided

as of April 20, 1999, pursuant to a separate

QILDRO to be entered by agreement of the

parties or by order of the court."

No other portion of the agreement addresses Jerry's pension.

In September 1999, the trial court entered the settlement agreement as an agreed supplemental order to its dissolution judgment.  In the order, the court noted the agreement was "fair[,] reasonable[, and] not unconscionable."

Nearly two years passed during which neither an agreement by the parties nor an order by the trial court divided the pension pursuant to a QILDRO.  In June 2001, the court entered a written order stating "[t]he entry of a *** []QILDRO[] is reserved.  [Jerry] shall notify [Susan], in writing, 30 days prior to making any application for retirement or request for retirement benefits" to allow Susan time to file for entry of a QILDRO prior to the commencement of the pension's disbursement.

No further action occurred until January 2009, when Susan filed a motion for entry of a QILDRO along with a proposed order directing Jerry to sign his consent to the QILDRO.  The record before us on appeal does not reflect whether Susan did so as a result of Jerry notifying her of his impending retirement.

In the QILDRO, Susan named herself as alternate payee and recipient of 50% of the marital portion of Jerry's monthly retirement benefit, any lump-sum payment upon termination of the

benefit, any partial refund becoming payable to Jerry, and any benefits payable to Jerry's beneficiaries upon his death.  The QILDRO set forth the following formula for calculating the marital portion of the pension: (A/B) x C x D where:

"'A' equals the number of months of *** regular plus permissive *** service that [Jerry] accumulated in [SERS] from the date of marriage[, June 7, 1975,] to the date of divorce[, June 4, 1999].  ***

'B' equals the number of months of *** regular plus permissive *** service that [Jerry] accumulated in [SERS] through [his] effective date of retirement. ***

'C' equals the gross amount of:

(i) [Jerry's] monthly retirement benefit *** calculated as of [Jerry's] effective date of retirement *** including *** permissive service, upgrades purchased, and other benefit formula enhancements;

(ii) [Jerry's] refund payable upon termination or lump[-]sum retirement benefit that becomes payable, including any payable interest *** calculated as of the

time said refund becomes payable to [Jerry];

(iii) [Jerry's] partial refund, including any payable interest *** calculated as of the time said partial refund becomes payable to [Jerry]; or

(iv) the death benefit payable to [Jerry's] death benefit beneficiaries or estate, including any payable interest *** calculated as of the time of said benefit becomes payable to [Jerry's] beneficiary.

'D' equals the percentage noted in [the sections of this QILDRO pertaining to monthly retirement benefit, termination refund, partial refund, and lump-sum death benefit], which ever are applicable."

The QILDRO further provided if Jerry's retirement benefits were subject to postretirement increases, Susan's share of the benefits "shall *** be recalculated or increased annually to include a proportionate share of the applicable annual increases."

In March 2009, the trial court held a hearing. At the hearing, Jerry's counsel objected to Susan's proposed QILDRO,

- 5 -

arguing the formula it set forth for distributing Jerry's SERS pension deviated from the court's September 1999 supplemental order, which Jerry alleged awarded Susan $42,000--half of the pension's value when he filed his dissolution petition in April 1999.  In response, Susan's counsel argued the parties' intent was not to limit her share of the SERS pension to $42,000 because the parties agreed to use a QILDRO to divide the pension rather than listing a specific dollar amount in the supplemental order and disbursing Susan's share of that value at the time of dissolution.  After the parties concluded their arguments, the court granted Jerry 30 days to file a written objection to Susan's proposed QILDRO.  Jerry filed a timely objection, raising the same arguments he presented before the court, and thereafter Susan filed her response, which also contained arguments similar to those raised at the hearing.

In June 2009, the trial court sent a letter opinion to both parties, ruling in Susan's favor.  In the opinion, the court reasoned as follows:

"The [a]greed [s]upplemental [o]rder specifically provided for the entry of a QILDRO in which the retirement benefits were to be divided as of April 20, 1999.  ***  [T]he applicable statute had just been enacted the month before the [a]greed [s]upplemental [o]rder was entered, and the matter was, therefore, new to all concerned.

The [o]rder does not specify that [Susan] is to receive $42,000[], and in the [c]ourt's opinion, if that were the intention of the parties, provision would have been made for the entry of judgment in that amount and a payment schedule. That was clearly not the intention of the parties. If [Susan's] portion were fixed at $42,000[], there would be no need for a QILDRO. A subsequent [o]rder on January 12, 2001[,] also reserved the entry of the QILDRO.

*** [T]he [SERS pension] was the major asset in the divorce proceeding, and [Jerry] was only 44 years old at the time [the court entered its order of dissolution]. Obviously, retirement was many years away. [Jerry] was to notify [Susan] in writing when he planned to retire so that the QILDRO could be entered.

It would be unconscionable to conclude now that the parties intended for [Susan] to wait untold years to receive her interest in the only major asset from the marriage, if her interest was fixed at $42,000[] and no more. Such an approach would deny her the benefit of interest on her asset or the

benefit of any [cost-of-living adjustment] or other increases in the value of the asset. The parties clearly intended to have a QILDRO entered, with the benefits divided using the customary formulaic approach. This is not a case *** where the parties reached a clear and unambiguous agreement that [Susan] should receive $42,000[] at some time in the future, with no interest on her asset and no increase in value through the intervening years. There was no such 'bargain[,]' and [Susan] cannot be held to this strained interpretation of the [a]greed [s]upplemental [o]rder."

The court further found Susan's proposed QILDRO conformed to the parties' agreement and ordered Jerry to sign the QILDRO and submit it to the court for entry. The court incorporated the letter opinion into its July 2009 written order.

This appeal followed.

## II. ANALYSIS

On appeal, Jerry argues the trial court erred in finding Susan's proposed QILDRO conformed to the parties' marital settlement agreement. Specifically, Jerry contends (1) the parties' agreement unambiguously valued the pension's marital portion at $84,000 and provided Susan would receive $42,000, exactly half without any interest or cost-of-living

adjustments, and (2) no language in the agreement indicated the use of the formula set forth in Susan's proposed QILDRO to divide the pension.

### A. The Pension's Value as Set Forth in the Settlement Agreement

First, Jerry argues the settlement agreement "unambiguously" values Susan's share of the pension as $42,000 and her share did not increase past the date of dissolution.

Pension benefits attributable to contributions made during marriage are marital property and thereby subject to division upon dissolution of marriage. 750 ILCS 5/503(b)(2) (West 2008). In the event of a dissolution, courts employ two different methods in distributing pension benefits: (1) the present-value or immediate-offset approach and (2) the reserved-jurisdiction approach.

When using the immediate-offset approach, the trial court "determines the present value of the pension plan, awards the entire pension to the employed party, and awards the other party enough other marital property to offset the pension award." In re Marriage of Ramsey, 339 Ill. App. 3d 752, 758, 792 N.E.2d 337, 343 (2003). Frequently, this method is impractical "either because of valuation difficulties or because the couple lacks sufficient readily divisible assets to provide an offsetting property award." Ramsey, 339 Ill. App. 3d at 758, 792 N.E.2d at 343. Thus, the reserved-jurisdiction method is often the more feasible approach.

Pursuant to the reserved-jurisdiction approach, the

- 9 -

trial court reserves jurisdiction to divide the pension "'if, as[,] and when' the pension becomes payable. [Citations.]" In re Marriage of Hunt, 78 Ill. App. 3d 653, 663, 397 N.E.2d 511, 519 (1979). Under this approach, a court determines the marital interest in a pension benefit "by dividing the number of years or months of marriage during which pension benefits accumulated by the total number of years or months benefits accumulated prior to retirement or being paid." In re Marriage of Richardson, 381 Ill. App. 3d 47, 52, 884 N.E.2d 1246, 1251 (2008). "The value of the marital interest is then calculated by multiplying the amount of each benefit payment as it is disbursed by the marital interest percentage." Richardson, 381 Ill. App. 3d at 52, 884 N.E.2d at 1251.

In the case at bar, the trial court opted to reserve jurisdiction as to the division of Jerry's pension until closer to his retirement rather than awarding Susan a lump sum of the pension's value at the time of dissolution. Over 10 years later, the parties now disagree as to the value of Susan's "equal" share.

"When interpreting a marital settlement, courts seek to give effect to the parties' intent." Allton v. Hintzsche, 373 Ill. App. 3d 708, 711, 870 N.E.2d 436, 439 (2007). When the agreement's terms are unambiguous, we determine the parties' intent solely from the instrument's plain language. In re Marriage of Schurtz, 382 Ill. App. 3d 1123, 1125, 891 N.E.2d 415, 417 (2008). An agreement is unambiguous when it contains

- 10 -

language susceptible to only one reasonable interpretation.  See Allton, 373 Ill. App. 3d at 711, 870 N.E.2d at 439 (stating "[a]n ambiguity exists when an agreement contains language that is susceptible to more than one reasonable interpretation"). Language is not ambiguous merely because the parties do not agree on its meaning.  In re Marriage of Wassom, 352 Ill. App. 3d 327, 331, 815 N.E.2d 1251, 1255 (2004).  Interpreting a marital settlement agreement is a question of law, which we review de novo.  Blum v. Koster, 235 Ill. 2d 21, 33, 919 N.E.2d 333, 340 (2009).

The pertinent language in the marital settlement agreement states as follows:

> "[Jerry] has certain retirement benefits
> through [SERS] which are valued at
> approximately $84,000 as of April 20, 1999,
> the date of entry of the [j]udgment of
> [d]issolution of [m]arriage on grounds.  Said
> retirement benefits shall be equally divided
> as of April 20, 1999, pursuant to a separate
> QILDRO to be entered by agreement of the
> parties or by order of the court."

Because the agreement states "[s]aid retirement benefits shall be equally divided as of April 20, 1999 [(the dissolution date)]" (emphasis added), Jerry contends the parties intended Susan's share of the marital portion to be $42,000, exactly half of $84,000, the pension's value as of the dissolution date.  He

- 11 -

further argues the agreement provided no express language permitting Susan interest or cost-of-living adjustments on her share of the pension. However, limiting Susan's share to $42,000 would allow Jerry the marital portion's entire growth in value between the date of dissolution and the date of his retirement, thereby rendering the parties' shares of the marital portion unequal. Accordingly, we find Jerry's interpretation of the agreement unreasonable because the agreement simply states an approximate value of the pension on the date of dissolution and provides Susan receive 50% of the retirement plan pursuant to a QILDRO filed in the future.

The settlement agreement never states Susan shall receive $42,000. Instead, the settlement agreement lists $84,000 as an approximate valuation of the pension's value on the dissolution date. The agreement further lists the dissolution date, April 20, 1999, for purposes of ascertaining the duration of the marriage. Both the approximate value of the pension and the end date of the marriage are set forth to assist in the later assessment and division of the pension's marital portion. The provision for entry of "a separate QILDRO" further evidences the parties' intent to ascertain the value of and equally divide the marital portion of the pension at a later date.

Jerry's pension is a defined-benefit plan pension. Under a defined-benefit plan, the value of the pension's benefit is determined at retirement based on years of service and final

salary.  See <u>Richardson</u>, 381 Ill. App. 3d at 54, 884 N.E.2d at 1253.  Each year of service is valued cumulatively: the longer SERS members work, the higher the percentage of their final salary they will collect as their pension.  See <u>Richardson</u>, 381 Ill. App. 3d at 54, 884 N.E.2d at 1253.  Because each year of service contributes to the overall value of the pension, the marital portion of the pension increases in value the longer the pension holder works.  Thus, its total value is unascertainable until the time of retirement, which is often years after the dissolution of marriage.

Essentially, Jerry argues the parties agreed to freeze Susan's share of the pension at the dissolution date.  This interpretation of the settlement agreement's plain language fails to award Susan the benefits associated with deferring receipt of her share of the pension until Jerry retires.  See <u>Ramsey</u>, 339 Ill. App. 3d at 759, 792 N.E.2d at 343-44.  Also, by postponing the division of the pension until it is received, both parties shared the risk Jerry would change jobs or die before retiring, which would reduce the pension substantially or forfeit its benefits completely.  See <u>Ramsey</u>, 339 Ill. App. 3d at 759, 792 N.E.2d at 343.  Because Susan and Jerry shared those risks when they agreed to postpone the division of the pension, equity requires they share in the benefits of unforseen increases in the value of the pension as well.  See <u>Ramsey</u>, 339 Ill. App. 3d at 759, 792 N.E.2d at 343.

Susan had no incentive to postpone receipt of a flat-

rate, lump-sum payment. The only reasonable interpretation of the parties' settlement agreement is the parties knew the marital portion would grow in value during the period between the dissolution of marriage and Jerry's retirement and thus opted to wait to equally divide the pension until its value fully matured and became ascertainable. Because Jerry's proposed interpretation of the agreement leads to an unfair and unreasonable result, we cannot conclude the parties intended Susan receive half the value of the pension's marital portion at the time of the dissolution. See In re Marriage of Davis, 286 Ill. App. 3d 1065, 1068, 678 N.E.2d 68, 70 (1997).

### B. Lump-Sum Survivor Benefit

Jerry also argues Susan's proposed QILDRO is contrary to the parties' intent because it awards Susan a share of any lump-sum survivor benefit paid in the event of Jerry's death. At the time of dissolution in 1999, the Pension Code did not permit division of any lump-sum survivor benefit pursuant to a QILDRO. 40 ILCS 5/1-119(b)(4) (West 1998) ("A QILDRO shall not apply to or affect the payment of any survivor's benefit [or] death benefit"). According to Jerry, by agreeing to the entry of a QILDRO, Susan thereby "effectively waived her right to any lump-sum survivor benefit paid on account of [Jerry's] death." In other words, Jerry contends Susan agreed to give up her share of the funds contributed during the parties' marriage in the event of Jerry's death.

However, Jerry raises this argument for the first time

- 14 -

on appeal. At the March 2009 hearing in which Jerry objected to Susan's proposed QILDRO, Jerry only argued the QILDRO was improper because it awarded Susan a share of the pension exceeding $42,000. Further, in his memorandum to the court following the March 2009 hearing, Jerry never objected to a lump-sum survivor benefit. Instead, he again focused his objection on the QILDRO's distribution to Susan of a portion of the pension exceeding $42,000, i.e., the interest on Susan's portion of the pension. "Issues not raised before the trial court are [forfeited] on appeal." Arcor, Inc. v. Haas, 363 Ill. App. 3d 396, 406, 842 N.E.2d 265, 274 (2005). As such, we need not consider Jerry's argument pertaining to the lump-sum provision contained in the proposed QILDRO.

## C. The Hunt Formula

Finally, Jerry contends the trial court erred in using the Hunt formula to divide the pension's marital portion because the settlement agreement lacked language explicitly directing its use.

As determined above, the parties' settlement agreement employs the reserved-jurisdiction approach. Thus, the parties elected to distribute the marital portion of the pension upon Jerry's retirement rather than awarding Susan her share in a lump sum immediately following the April 1999 dissolution.

Under the reserved-jurisdiction approach, entry of a QILDRO is necessary to direct the applicable governmental retirement system to pay a portion of the pension to a payee

- 15 -

other than the pension holder.  40 ILCS 5/1-119 (West 2008).  A "QILDRO" is "an Illinois court order that creates or recognizes the existence of an alternate payee's right to receive all or a portion of a member's accrued benefits in a retirement system." 40 ILCS 5/1-119(a)(6) (West 2008).  To be valid, a QILDRO must be entered by the court and contain written consent from the party holding the pension.  40 ILCS 5/1-119(a)(6), (m)(1) (West 2008).

In the case at bar, the parties agreed to divide the marital portion of the pension "equally" pursuant to the entry of a QILDRO, and the trial court incorporated the parties' settlement agreement into its September 1999 supplemental order. During this time, section 1-119 of the Illinois Pension Code required QILDROs contain, in pertinent part, the following language:

"(i) Of the member's retirement benefit, the [r]etirement [s]ystem shall pay to the alternate payee $.......... per month, beginning *** and ending upon the termination of the retirement benefit or the death of the alternate payee, whichever occurs first.

(ii) Of any member's refund that becomes payable, the [r]etirement [s]ystem shall pay to the alternate payee $.......... when the member's refund becomes payable."  40 ILCS 5/1-119(n) (West 2000).

- 16 -

In 2006, the General Assembly modified section 1-119 to include within a QILDRO the formula by which to divide the marital portion of a pension benefit. 40 ILCS 5/1-119(n) (West 2006). The formula used, commonly known as the "Hunt formula," calculates the marital portion in each pension payment with "a fraction of that payment, the numerator of the fraction being the number of years (or months) of marriage during which benefits were being accumulated, the denominator being the total number of years (or months) during which benefits were accumulated prior to when paid." Hunt, 78 Ill. App. 3d at 663, 397 N.E.2d at 519. The QILDRO provision enumerating said formula states as follows:

> "(2) .......% [enter percentage] per
> month of the marital portion of said benefit
> with the marital portion defined using the
> [Hunt] formula ***." 40 ILCS 5/1-119(n)
> (West 2008).

Here, the trial court found the parties intended to divide the marital portion of the pension pursuant to the "customary formulaic approach," as used in Susan's proposed QILDRO. Jerry maintains the court erred in using the Hunt formula to determine the value of the marital portion of the pension because at the time of the court's agreed supplemental order in September 1999, QILDROs did not specify the Hunt formula for dividing the marital portion of pensions and therefore the parties could not have intended the formula's use.

- 17 -

In support of his argument, Jerry cites In re Marriage of Wenc, 294 Ill. App. 3d 239, 689 N.E.2d 424 (1998), for the proposition trial courts may not infer the parties intended use of the Hunt formula when the marital settlement agreement lacked language indicating application of any such formula.  In Wenc, the parties' settlement agreement stated, in pertinent part, as follows:

> "'[Husband/pension holder's] represented adjusted contribution to the Teacher Retirement Fund is *** $ 27,000.  In addition thereto, [husband's] estimated pension, assuming a retirement age of 55, is in the approximate sum of $ 677[] per month, with an additional annuity of $ 1,212[] per month. [Wife/alternate payee] shall be entitled to receive 30% of all of [husband's] vested, non[]vested[,] and/or accrued pension/ retirement benefits accumulated as of the date hereof [i.e., the date of the dissolution] at such time in the future when and if said benefits are paid to [husband]. All benefits accrued or accumulated by [husband] hereafter shall be his sole and exclusive property.'"  Wenc, 294 Ill. App. 3d at 241, 689 N.E.2d at 425.

The Second District Appellate Court found the trial court erred

in distributing the pension pursuant to the <u>Hunt</u> formula because the agreement contained ambiguous phrases and sums. <u>Wenc</u>, 294 Ill. App. 3d at 244, 689 N.E.2d at 427. Specifically, the Second District determined the agreement contained (1) "unexplained verbiage"; (2) unclear phrases such as "'vested, non-vested, and/or accrued pension benefits'" and "'accumulated or accrued'"; and (3) a "mysterious reference" to a $1,212 additional annuity. <u>Wenc</u>, 294 Ill. App. 3d at 245, 247, 689 N.E.2d at 428, 429. Because the numerous, ambiguous terms conflicted with the <u>Hunt</u> formula, the appellate court rejected the trial court's use of the <u>Hunt</u> formula and remanded to ascertain the parties' intent via extrinsic evidence. <u>Wenc</u>, 294 Ill. App. 3d at 248, 689 N.E.2d at 430.

Unlike the parties' settlement agreement in <u>Wenc</u>, the parties' agreement in this case does not contain mysterious sums and a surplusage of ambiguous phrases. Rather, it contains no explicit language directing the trial court how to divide the marital portion of the pension other than to do so "equally." Therefore, this case is dissimilar to <u>Wenc</u> and more akin to <u>Richardson</u>. In <u>Richardson</u>, pursuant to the parties' settlement agreement, the trial court entered the following order:

> "'Wife is hereby awarded one-half (1/2) of
> Husband's pension as it has accrued form
> [<u>sic</u>] the date of the marriage to the date of
> the entry of this [j]udgment of [d]issolution
> of [m]arriage. This court shall retain

- 19 -

jurisdiction of this cause for the purpose of entering a Qualified Domestic Relations Order.'" Richardson, 381 Ill. App. 3d at 48, 884 N.E.2d at 1248.

Years later, the court divided the pension pursuant to the Hunt formula. Richardson, 381 Ill. App. 3d at 51, 884 N.E.2d at 1251. The ex-husband appealed, arguing his ex-wife was limited to 50% of the pension's value as of the date of dissolution. Richardson, 381 Ill. App. 3d at 51, 884 N.E.2d at 1251. The First District Appellate Court disagreed with the ex-husband and affirmed, reasoning the parties clearly intended to use the reserved-jurisdiction approach and the Hunt formula was a reasonable method to calculate the marital portion of the ex-husband's pension because the parties' agreement itself failed to set forth how to calculate the marital portion. Richardson, 381 Ill. App. 3d at 53, 884 N.E.2d at 1252.

As in Richardson, the trial court's judgment incorporating the parties' settlement agreement in this case did not contain a provision specifying use of the Hunt formula to divide the marital portion of the pension. Above, we determined the parties intended to divide the marital portion of the pension once it had fully matured, presumably at the time of Jerry's retirement. The parties' agreement merely indicates each party will receive an equal share of the marital portion, but it contains no other language indicating how to value the marital portion at the time of payout. The trial court stated

- 20 -

the parties intended to divide the pension by "the customary formulaic approach," and we agree. While the settlement agreement did not expressly enumerate the formula by which to equally divide the pension's marital portion, the parties' intent is evidenced by the fact the parties chose to use the reserved-jurisdiction approach and later entry of a QILDRO and did not use language contrary to the customary formulaic approach set forth in Hunt.

The Hunt formula, stated in 1979, is a widely used method for dividing pensions' marital portions under the reserved-jurisdiction approach, especially where the approach applies to defined-benefit plan pensions. See Richardson, 381 Ill. App. 3d at 52, 884 N.E.2d at 1251; In re Marriage of Sawicki, 346 Ill. App. 3d 1107, 1115, 806 N.E.2d 701, 708 (2004). This was the case at the time of the trial court's supplemental order incorporating the parties' settlement agreement in 1999. The General Assembly's subsequent endorsement of the Hunt formula by amending section 1-119 of the Illinois Pension Code to include it within QILDROs addressing the division of governmental pensions' marital portions (see 40 ILCS 5/1-119(n) (West 2008)) further indicates the formula's widespread acceptance. Jerry and Susan agreed to equally divide the marital portion of the pension via the reserved-jurisdiction approach and did not include within the settlement agreement any language conflicting with the commonly accepted Hunt formula. Therefore, the trial court did not abuse its discretion in

- 21 -

allocating the pension's marital portion pursuant to <u>Hunt</u>.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.  We commend the trial court for its letter opinion, which this court found most helpful.

Affirmed.

MYERSCOUGH, P.J., and POPE, J., concur.