NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210494-U

NO. 4-21-0494

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 6, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| ELIZABETH ANN CUNNINGHAM, | ) | Circuit Court of |
| Petitioner-Appellant, | ) | De Witt County |
| and | ) | No. 01D84 |
| JEFFREY EDWARD CUNNINGHAM, | ) | |
| Respondent-Appellee. | ) | Honorable |
| | ) | Gary A. Webber, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court committed no error in terminating former husband's maintenance obligation.

(2) Former wife failed to establish that the trial court erred (a) by denying her first amended petition for indirect civil contempt based on her former husband's alleged nonpayment or underpayment of child support or (b) in calculating her former husband's child support arrearage. However, she did establish error due to the court's failure to impose mandatory statutory interest on the former husband's child support arrearages.

(3) The trial court's allocation of attorney fees was not an abuse of discretion.

¶ 2    In 2002, petitioner, Elizabeth Ann Cunningham, and respondent, Jeffrey Edward Cunningham, were divorced. In 2021, the trial court terminated Jeffrey's maintenance obligation and denied Elizabeth's petition to hold Jeffrey in indirect civil contempt for not paying or not paying enough child support. The court further assessed a child support arrearage against Jeffrey

and additionally ordered him to contribute to Elizabeth's reasonable attorney fees. Elizabeth appeals, arguing the court erred by (1) terminating rather than extending Jeffrey's maintenance obligation, (2) denying her petition for indirect civil contempt and refusing to impose mandatory statutory interest in connection with Jeffrey's child support arrearages, and (3) ordering Jeffrey to pay only one-fifth of her reasonable attorney fees. We affirm in part, reverse in part, and remand for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4                              A. Dissolution Proceedings

¶ 5         The parties were married on December 27, 1991. Approximately 10 years later, on December 7, 2001, Elizabeth filed a petition for dissolution of marriage. At the time the petition was filed, the parties were the parents of three children (born in October 1992, August 1995, and September 2000), and Elizabeth was pregnant with a fourth child (born in February 2002).

¶ 6         In July 2002, the trial court conducted a hearing on the dissolution petition. The record does not contain a transcript of that hearing, but the court's docket entry shows it heard testimony, ordered the parties' marriage dissolved, and approved the parties' marital settlement agreement. According to the court's docket entry, the parties were to have joint custody of the minor children with Elizabeth being their primary care provider. It further states as follows:

> "Child support is set in the [amount of] $1093.96 payable every other week beginning July 19, 2002, plus 40% of any net bonus received each year by [Jeffrey]. *** Maintenance is awarded to Elizabeth *** in the [amount] of $546.98 every other week beginning July 19, 2002, are [*sic*] rehabilitative maintenance and is subject to modification after Jan[uary] 17, 2005[,] or prior to that date if there is [*sic*] sufficient grounds for modification. *** Written [marital settlement

agreement] to be filed. *** [Elizabeth's attorney] to prepare the necessary settlement documents and submit same to [Jeffrey's attorney] for approval as to form."

¶ 7 In November 2002, the judgment of dissolution of marriage, entered by the trial court and approved by both parties, was filed. According to the judgment, Elizabeth was 38 years old and a homemaker, while Jeffrey was 36 years old and worked for AmerGen Energy Company. The judgment described the parties' marital settlement agreement as an "oral settlement agreement" that was "established by testimony in open court" and "approved and adopted by the court" as set forth within the judgment. Regarding child support and maintenance, the judgment stated as follows:

"C. That *** Jeffrey *** is ordered to pay as and for reasonable child support for the minor child [*sic*] of the parties herein, the sum of $1,093.96 every two weeks with the first payment commencing July 19, 2002, and continuing every other week thereafter. In addition[,] [Jeffrey] shall pay as and for child support 40% of his net annual bonuses.

[Jeffrey] is also ordered to pay *** maintenance to [Elizabeth] in the amount of $546.98 payable every other week commencing July 19, 2002[,] and said maintenance shall be reviewed after January 17, 2005.

* * *

E. By virtue of receiving maintenance[,] [Elizabeth] shall be under a continuing obligation to find employment. This may dictate finding employment outside the County of Dewitt [*sic*] and thereby requiring a move for [Elizabeth] and the minor children to other areas."

According to the judgment, Elizabeth received a portion of Jeffrey's retirement benefits and 60% of the parties' marital property.

¶ 8                               B. The Parties' Filings for
                              Modification, Review, and Other Relief

¶ 9        Neither party sought review or modification of maintenance or child support until December 27, 2019, when Jeffrey *pro se* filed a motion to terminate both his maintenance and child support obligations. He alleged Elizabeth had "been working for greater *** than two years" as required by the dissolution judgment, and he noted that the parties' youngest child, and "the last remaining child at home," would be 18 years old in February 2020. Jeffrey requested child support payments be stopped on May 16, 2020, the last day of high school for the parties' youngest child. He also asked that child support paid from his most recent annual bonus be reduced to 20% to account "for only one child being at home for the year 2020."

¶ 10        Jeffrey later obtained counsel and was allowed to amend his *pro se* filing. In his amended "Petition to Modify," he sought to terminate maintenance and modify child support, alleging substantial changes in circumstances since the time of the parties' divorce. According to Jeffrey, Elizabeth was a homemaker when the parties divorced and had a four-year college degree in education, which she received from Illinois State University. He maintained she had the ability to support herself and that her income had increased since the divorce. Jeffrey further alleged that two of the parties' children had graduated from college, one was currently in college and resided with Jeffrey when not in school, and the parties' youngest child would graduate from high school in May 2020 and enroll in college. Jeffrey alleged he was paying for the college expenses of the child currently in college and that he would also be paying for the college tuition of the parties' youngest child.

¶ 11        In February 2020, Elizabeth filed a counter-petition seeking to modify and extend

Jeffrey's maintenance obligation and contribution to the college expenses of the parties' two youngest children. She also later amended her counter-petition. Regarding maintenance, she asked the trial court to both increase and extend Jeffrey's obligation to pay. Elizabeth maintained she had, in good faith, attempted to rehabilitate herself but was "unable to maintain the standard of living at the time of dissolution." She asserted her need for maintenance continued and an increase was required to maintain the parties' prior standard of living. Elizabeth further asserted Jeffrey had the ability to continue maintenance payments indefinitely.

¶ 12    In April 2020, Elizabeth filed a petition for adjudication of indirect civil contempt. She alleged that as part of his child support obligation, Jeffrey had "historically received and paid [to her] an amount alleged to be 40% of his net annual bonuses in February of each and every year." Elizabeth maintained that Jeffrey failed to pay an amount representing 40% of his "net annual bonuses" in 2020 and, thus, was believed to be approximately 60 days in arrears. She alleged Jeffrey's failure to pay child support was "a willful and contumacious violation of" the trial court's prior orders and asked the court to find him to be in indirect civil contempt.

¶ 13    Elizabeth amended her contempt claim, filing a first amended petition for adjudication of indirect civil contempt. In her amended petition, Elizabeth alleged that she learned through discovery that Jeffrey "failed to make his child support payments in the amount of 40% of his net annual bonuses for a period in excess of 10 years." She also realleged that he had failed to pay child support representing "40% of his net annual bonuses" in 2020. Further, Elizabeth maintained that interest was "accruing on all arrearages at the rate of 9% annually." In December 2020, Elizabeth filed a petition to determine child support arrearage, alleging Jeffrey had had failed to pay her "the full 40% of his net annual bonuses in an amount in excess of $500,000," which was also "accruing interest annually at 9%."

¶ 14    In July 2020, Jeffrey filed his own petition for contempt, alleging the parties had been ordered to each pay one-half of their children's uncovered medical expenses and that Elizabeth refused to pay her portion of uncovered medical expenses totaling $6162.06, *i.e.*, $3081.03. He alleged Elizabeth's actions were "willful and contemptuous," and asked the trial court to find her in contempt.

¶ 15    In March 2021, Elizabeth filed a petition for contribution to attorney fees, asking the trial court for an award of attorney fees from Jeffrey in the amount of $36,796.50. Elizabeth argued she lacked the financial ability to pay the attorney fees she incurred and asserted she earned approximately $27,809.59 per year. Conversely, she maintained Jeffrey had the financial ability to contribute to her fees, arguing he had yearly gross income of $362,916, and other assets.

¶ 16    Finally, in April 2021, Elizabeth filed a pretrial memorandum. Relevant to this appeal, she alleged a total child support arrearage with interest of $853,903.68, based on Jeffrey's failure to fully pay 40% of his "net annual bonuses" from 2004 to 2020. She maintained all income Jeffrey received above his "base salary" was "bonus income" from which 40% of the net annual amount should have been paid as child support. Elizabeth also asked the trial court to award permanent maintenance, asserting she was not financially independent and could not ever obtain the standard of living that the parties enjoyed during the marriage. Elizabeth asked the court to increase maintenance to $8585.68 per month.

¶ 17                    C. Evidentiary Hearings

¶ 18    In April and May 2021, the trial court conducted hearings on all pending issues. At the outset, the parties agreed that the purpose of the hearings with respect to maintenance was "to have maintenance reviewed."

¶ 19    Evidence showed that in 1986, prior to the parties' marriage, Elizabeth obtained an

elementary education degree from Illinois State University. During the marriage, her student loans were "paid off," and she initially worked as a teaching assistant. Once the parties started their family, they agreed Elizabeth would "stay home with the kids ***." She testified she was the children's primary caretaker while the parties were married and continued as "the custodial parent after the divorce."

¶ 20 During the marriage and through the time of the underlying proceedings, Jeffrey worked for Clinton Power Station, which was sold a few times over the years and had undergone name changes. Jeffrey testified that at the time of the parties' divorce, he earned $119,000 a year from his employment. He acknowledged that after the divorce, he received promotions and pay increases. Jeffrey testified that on average, he worked 60 hours a week. He asserted he had been hospitalized twice as the result of "[c]ontinuous work during an outage." In 2019, his gross earnings were $383,070.18.

¶ 21 The record reflects that before the marriage, Jeffrey purchased what would become the marital residence on two acres of land for $33,000. The parties planned to build a different house on the property and, during the marriage, built a three-car garage. Elizabeth testified that while married, the parties took yearly vacations with their children to places like Florida, Tennessee, Missouri, or South Dakota. They owned a camper which they pulled with a Suburban and often went camping during the summer. According to Elizabeth, the parties lived a "simple lifestyle" but did enjoy vacations and did not have to worry about paying the bills.

¶ 22 Elizabeth testified she had her "teacher's license," and with her degree, she could work as a full-time teacher. She did not look for work outside the home, specifically a teaching position, until the parties' youngest child was five years old and in kindergarten. At that time, she had been out of the workforce for 15 years and asserted her teaching degree "was pretty much

- 7 -

obsolete by then" when compared to someone "right out of college" with "all the new theories and practices." Elizabeth asserted she tried hard to find a teaching position and began by substitute teaching. She worked as a substitute teacher from 2007 to 2009, and earned $80 per day.

¶ 23 From 2008 to 2009, Elizabeth also worked a part-time job for "ADM" and was paid hourly. Elizabeth testified she left her job with ADM because she got a full-time job as a library aide for a school district, earning $11 per hour. After approximately two years, she began working full-time as a teaching assistant in Clinton, Illinois. She won a teacher-of-the-year award while in that position. Ultimately, in 2017, Elizabeth obtained a full-time position as a fifth-grade teacher in Decatur, Illinois, earning $36,000 a year. However, she left that job after only two months because it was "too stressful." She asserted there was a lack of support from the principal, who was inexperienced, and there were behavior issues with students in her classroom.

¶ 24 At the time of the underlying hearings, Elizabeth worked for a church in Clinton. She worked 35 hours a week, earning $2303 per month and approximately $27,636 per year. Elizabeth testified she also had a "side business" selling skin care products. She stated she had not applied for any teaching jobs in the last four years.

¶ 25 Jeffrey testified that following the divorce, he resided "in a camping trailer" for 8 to 10 years while he "recovered financially from the divorce." Evidence showed that Elizabeth received the marital residence, which she sold shortly after the divorce for approximately $75,000. Elizabeth testified she moved to her current home, which evidence suggested she purchased for $175,000.

¶ 26 Elizabeth testified her current residence was a five-bedroom home that she lived in by herself. She incurred approximately $1200 a month in housing expenses, including her mortgage, a home equity loan, real estate taxes, and homeowner's insurance. Elizabeth testified

she was in the process of selling her home to lower her monthly expenses. The fair market value of the residence was $219,000, and she still owed approximately $29,468.94 on the residence. Elizabeth testified it was her intention that her next home would be smaller in size and paid for with cash so that she would have no mortgage.

¶ 27 Elizabeth maintained her current monthly expenses were more than her monthly income in the absence of child support and maintenance. She identified a financial affidavit she prepared in April 2021, reporting her available monthly income as $2011.63, and total monthly living expenses and debt payments of $6167.26. She testified she had two retirement accounts valued at $146,574.81 and $46,016. At the time of the underlying hearings, she was 57 years old and believed she would retire at age 67. Elizabeth testified that with her current income, she was "[m]aking ends meet" and "keeping [her] bills paid," but she was "not getting [her] loans paid off." She testified she was currently unable to afford her attorney fees.

¶ 28 Elizabeth denied that a full-time teaching position that paid $36,000 per year could sustain a lifestyle like the one the parties enjoyed during the marriage. With her teaching degree, she did not expect to ever earn what Jeffrey made during the marriage. Elizabeth asserted she was asking the trial court for an "extended permanent upward deviation amount for maintenance," specifically maintenance of $8585.68 per month.

¶ 29 On examination by Jeffrey's counsel, Elizabeth agreed the parties were married for just under 10 years when the petition for dissolution of marriage was filed. She also acknowledged that Jeffrey paid maintenance to her for approximately 18 years following the divorce. Elizabeth agreed that while it was her assertion that her teaching degree was "obsolete," she was able to obtain the full-time teaching position in Decatur in 2017. Further, she agreed that she had an IMRF pension from which she was entitled to receive approximately $170 a month at her current age.

¶ 30       According to Jeffrey, maintenance was to be reviewed in 2005 because Elizabeth "was to find employment using her teaching degree ***." He testified Elizabeth was not disabled in any way and there was nothing at the time of the divorce that prevented her from obtaining full-time employment. Jeffrey asserted he did not seek a review of maintenance in 2005 because he did not understand that he had the ability to do that. He also did not want to disrupt his children's lifestyle. Elizabeth acknowledged that per the dissolution judgment, it was anticipated that she would find employment and that she "would be looking for a teaching job."

¶ 31       Jeffrey asked the trial court to terminate maintenance as of December 27, 2019, and noted he continued to pay maintenance until December 2020, resulting in an overpayment of approximately $14,221.48 if his motion to terminate was granted. Additionally, he asserted that he was paying 100% of the college-related expenses for the parties' two youngest children. Jeffrey testified he would be unable to pay those expenses if he were ordered to continue paying maintenance. He acknowledged he was also paying the college expenses of his stepson. Jeffrey testified he obtained loans to help pay for the children's schooling and his current wife also had student loans. He estimated he currently owed $99,000 in college loans. He further reported that he had purchased vehicles for all of the children, which he paid to maintain and insure.

¶ 32       Elizabeth testified that under the dissolution judgment, she received child support from Jeffrey in two ways: (1) biweekly payments and (2) 40% of his "net annual bonuses." She maintained that during discovery in the underlying proceedings she came across "new information" that Jeffrey "received more than just one bonus in a year." Elizabeth believed she had not "been receiving the total bonus award that Jeffrey ha[d] been receiving from his employer."

¶ 33       Jeffrey testified that the portions of his bonuses paid to Elizabeth as child support from 2004 through 2017 were calculated and automatically withheld by his employer. He stated

the withholding was set up after the "divorce agreement" and his employer was given "an order *** for a fixed amount of child support, a fixed amount of maintenance, and 40[%] of [his] annual bonuses ***." Due to changes in his employer's system, he had to manually calculate the bonus amounts he owed in 2018 and 2019, and then make payments on his own through the State Disbursement Unit. Jeffrey acknowledged having "one of [his] bonuses left to pay" to Elizabeth, representing the amount due in 2020. Jeffrey testified he was under the impression that he did not have to pay 40% of his net annual bonus to Elizabeth in 2020 because, due to the ongoing litigation, he did not know what percentage to pay. He asked the court to modify the percentage he was required to pay from 40% to 20%, asserting the 40% figure was based on the fact that the parties had four children and, at the time modification was sought, only one of the parties' children was under the age of majority. Jeffrey testified the gross amount of his bonus from which child support was to be paid in 2020 was $83,420.65, with a net amount of $58,313.

¶ 34　　　　　Jeffrey denied that he had failed to pay to Elizabeth all amounts he owed for child support from his bonuses. He testified all payments had been made with the exception of the 2020 payment, which he was requesting be reduced. Jeffrey explained that at the time of the parties' divorce, he was a "Level 4 manager" for his employer. The only bonus he received was an "annual incentive plan" (AIP) bonus, which was based on both the company's performance and his performance. In 2003, Jeffrey was promoted to a "Level 6." He stated Level 6 employees became eligible for a "long-term incentive program." Under that program, he received "stock options" and then "restricted stock units," which would vest and could be exercised after a three-year period if he remained with his employer. Jeffrey maintained that two of the years he received stock options, the price of the stock went down, "so they were worth nothing and not exercised." Jeffrey testified that the last three years of his employment, he received "a more cash-centered award." He

explained as follows:

> "It gives you a fixed amount based on the position in the company and then just paid out over a three-year period. The incentive is to keep—keep what we call key managers, levels 5 and 6. Anything above Level 5, keep managers working for the company as a retention plan so that we don't take our technical expertise and knowledge to another company."

¶ 35       Jeffrey denied stocks or amounts he received under the long-term incentive program were considered bonuses. Instead, he described them as "a built-in retention plan." He maintained that the only bonus he received throughout his employment was his AIP bonus, which he had been paying 40% of for child support. However, he acknowledged that he was at the point in his career where the restricted stock units he received vested "pretty much every year" and he could receive income from those if he chose. Jeffrey asserted he typically "cash[ed] those stocks" to pay for his children's college expenses.

¶ 36       Jeffrey testified he was asking the trial court to terminate child support as of May 2020, the month the parties' youngest child graduated from high school. He testified child support was withheld from his pay through August 2020 and, therefore, he would have overpaid child support in the amount of $5468.45.

¶ 37                          D. The Trial Court's Rulings

¶ 38       On May 17, 2021, the trial court set forth its rulings in the case. Initially, it found no contempt by Elizabeth as to the issue of unpaid medical expenses. However, it ordered her to reimburse Jeffrey for medical expenses he paid in an amount totaling $1474.91.

¶ 39       The trial court next terminated Jeffrey's maintenance obligation retroactive to December 27, 2019. The court noted the maintenance provided for in the dissolution judgment

- 12 -

was not assessed by the court but agreed upon by the parties. It found that the type of maintenance provided for under the agreement was rehabilitative maintenance, stating as follows:

> "With regard to the type of maintenance we are dealing with, it doesn't specifically state in the agreement that was entered by the parties, it doesn't specifically state rehabilitative maintenance, but it does say [Elizabeth] is under an obligation to seek and find work and possibly have to move away from the area, and as [Jeffrey's counsel] pointed out, this was drafted by [Elizabeth's] counsel.

> If there is some ambiguity as to whether this is rehabilitative maintenance *** the disparity should be resolved against the drafter of that order, but I think it's fairly clear, just from the language that she is to find work, that this is rehabilitative maintenance which means [Elizabeth] is under an obligation to seek and find work."

The court also pointed out that the docket entry, detailing what occurred when the parties' marital settlement agreement was set forth in open court, also identified the type of maintenance agreed to by the parties as rehabilitative maintenance.

¶ 40　　　　The record reflects that in determining whether to alter maintenance, the trial court considered factors set forth in section 510(a-5) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/510(a-5) (West 2018)). Further, in setting forth its decision, the court found that although the parties' agreement did not explicitly state that Elizabeth had to get a teaching job, there was an "underlying principle that parties should try to work to the best of their ability" and, therefore, it was "expected that [Elizabeth] would find a job comparable to what she could get at least as a teacher." The court determined Elizabeth did not make reasonable efforts to find such employment and was "currently voluntarily underemployed." It also held Jeffery

overpaid maintenance to Elizabeth in the amount of $13,749.50.

¶ 41    The trial court additionally denied Elizabeth's motion for indirect civil contempt for unpaid child support. It held that the parties' agreement referenced only Jeffrey's AIP bonus— the one bonus he was receiving at the time the marital settlement agreement was entered into. The court found Jeffrey overpaid his fixed child support payments by $5468.45, but that he underpaid his child support obligations which were to be based on a percentage of his bonuses in 2018, 2019, and 2020, in the amount of $30,076.34. From that amount, the court subtracted Jeffrey's overpayments of maintenance and child support and credited him with the amount of medical expenses owed to him by Elizabeth. The court determined Jeffrey owed Elizabeth a balance of $9383.43.

¶ 42    Finally, the trial court noted Jeffrey agreed that due to the termination of maintenance, he would pay the college expenses for the parties' youngest two children. The court also ordered Jeffrey to contribute to Elizabeth's attorney fees in the amount of $9172.70.

¶ 43    In June 2021, Elizabeth filed a motion to reconsider. In August 2021, the trial court denied her motion.

¶ 44    This appeal followed.

¶ 45                                    II. ANALYSIS

¶ 46                                    A. Maintenance

¶ 47              1. *Ambiguity in the Marital Settlement Agreement*

¶ 48    On appeal, Elizabeth first challenges the trial court's termination of maintenance, arguing it erred in finding the November 2002 dissolution judgment, which set forth the terms of the parties' oral marital settlement agreement, was ambiguous and relying on extrinsic evidence to determine the nature, type, and duration of maintenance. Her argument suggests the court erred

in finding the maintenance awarded was rehabilitative, and she asserts that under the plain language of the parties' agreement, maintenance was "not limited in its duration."

¶ 49 Generally, "there are four common types of maintenance: permanent maintenance, rehabilitative maintenance for a fixed term, rehabilitative maintenance with a review date, and maintenance in gross. *In re Marriage of Van Hoveln*, 2018 IL App (4th) 180112, ¶ 30, 115 N.E.3d 477. "Rehabilitative maintenance is intended to assist and encourage dependent spouses to become financially independent." *Id.* Such an award "may be appropriate where the spouse is or may become employable at an income that would provide the same standard of living the parties enjoyed during their marriage." *In re Marriage of Price*, 2013 IL App (4th) 120155, ¶ 30, 986 N.E.2d 236. On the other hand, "[a]n award of permanent maintenance may be appropriate where one spouse is not employable or is only employable at a lower income as compared to the parties' standard of living during the marriage." *Id.*

¶ 50 "[T]he terms of the marital settlement agreement are binding on the parties and the court." *Blum v. Koster*, 235 Ill. 2d 21, 32, 919 N.E.2d 333, 340 (2009). Further, "[a] marital settlement agreement is construed in the manner of any other contract[.]" *Blum*, 235 Ill. 2d at 33. When the terms of the agreement are unambiguous, the parties' intent must be determined "solely from the instrument's plain language." *In re Marriage of Culp*, 399 Ill. App. 3d 542, 547, 936 N.E.2d 1040, 1045 (2010). "An agreement is unambiguous when it contains language susceptible to only one reasonable interpretation." *Id.* However, when the agreement's terms are ambiguous, parol evidence may be used to ascertain the parties' intent. *In re Marriage of Farrell & Howe*, 2017 IL App (1st) 170611, ¶ 12, 96 N.E.3d 516. Ultimately, "[t]he interpretation of a marital settlement agreement is reviewed *de novo* as a question of law." *Blum*, 235 Ill. 2d at 33.

¶ 51 Here, we find no error in the trial court's finding that the type of maintenance agreed

upon by the parties was rehabilitative maintenance. Although Elizabeth argues the court found the parties' agreement on maintenance was ambiguous, the record reflects it actually described the dissolution judgment as being "fairly clear" regarding the type of maintenance Jeffrey was obligated to pay. It noted that while the judgment did not explicitly state that maintenance was rehabilitative, it did provide that Elizabeth had an obligation to seek employment and that maintenance was reviewable after a specified time period. We agree that such circumstances are indicative of a rehabilitative maintenance award. See *id.* at 35 (finding maintenance provided for in a marital settlement agreement was "intended to be rehabilitative" although not identified as such, in part, because the payee spouse was obligated "to make a reasonable effort to become self-supporting" and maintenance was reviewable after the 61 months).

¶ 52　　　　　Additionally, given the lack of specificity in the parties' written agreement, we find the court was warranted in additionally considering evidence outside of that document. In particular, the record in this case shows the original trial judge made a docket entry following the July 2002 hearing on the petition for dissolution of marriage. During that hearing the parties testified to the terms of their marital settlement agreement, which the court "ratified, confirmed, and approved." The court's docket entry set forth the terms of the parties' agreement and explicitly identified the agreed-upon maintenance obligation as rehabilitative.

¶ 53　　　　　Accordingly, the record clearly establishes an intent by the parties that the maintenance awarded to Elizabeth was rehabilitative. To the extent she asserts otherwise on appeal, her argument is without merit.

¶ 54　　　　　　　　　　　　2. *Scope of Maintenance Review*

¶ 55　　　　　Elizabeth also argues that the trial court erred "in applying a 'general review' standard to the review of [her] maintenance as opposed to applying a 'limited scope review.' "

- 16 -

Specifically, she contends the scope of the trial court's maintenance review was limited by the parties' agreement, which provided that "the only prerequisite to her continued receipt of maintenance was for her to remain employed." She maintains the agreement did not require her to seek full-time employment in the field of teaching and the court abused its discretion in so holding.

¶ 56    Section 510(a-5) of the Dissolution Act (750 ILCS 5/510(a-5) (West 2018)) provides for the modification, termination, and review of maintenance.

> "Section 510(a-5) [of the Dissolution Act] applies to proceedings to terminate maintenance, modify maintenance, and review maintenance. In all three, the Dissolution Act directs the factors in section 504(a) and section 510(a-5) are to be considered. [Citation.] Each of these seek a modification to the original order. The only difference between the types of proceedings is the basis for the trial court's authority to modify the original agreement. In review proceedings, the court provided authority to revisit the order, whereas in termination or modification proceedings, the legislature provides authority so long as there has been a substantial change in circumstances." *In re Marriage of Kasprzyk*, 2019 IL App (4th) 170838, ¶ 36, 128 N.E.3d 1105 (citing 750 ILCS 5/510(a-5) (West 2016)).

¶ 57    Additionally, the scope of a maintenance review proceeding can be general or limited. *In re Marriage of Heasley*, 2014 IL App (2d) 130937, ¶ 27, 25 N.E.3d 1137. A general review of maintenance will involve consideration of all factors in section 510(a-5). *Id.* In a limited review, the trial court considers only certain issues as previously defined by either the court or the parties. See *In re Marriage of Golden*, 358 Ill. App. 3d 464, 470, 831 N.E.2d 1177, 1183 (2005) ("[T]he trial court can define the scope of the review, including limiting the review to certain issues."); *Blum*, 235 Ill. 2d at 32 ("The factors set forth in section 510(a-5) are inapplicable when

the parties have otherwise agreed on the terms of modification and termination of maintenance in a written marital settlement agreement approved by the court[.]").

¶ 58 Here the parties' marital settlement agreement provided that maintenance was reviewable. Additionally, at the outset of the underlying hearings before the trial court, both parties agreed that they were proceeding with a maintenance review, rather than a request for maintenance modification. The trial court proceeded with a review based on those representations.

¶ 59 To support her contention that a limited review was required in this case, Elizabeth relies on the Second District's decision in *Heasley*. There, the trial court entered an order in December 2007, requiring the former husband to pay his former wife maintenance that was reviewable after 24 months and with the expectation that the wife would seek either full-time employment or additional schooling. *Heasley*, 2014 IL App (2d) 130937, ¶ 4. In December 2009, the husband filed a motion in which he sought to terminate or reduce his maintenance obligation. *Id.* ¶ 5. In November 2010, the court denied the motion and directed the wife " 'to remain fully employed and to seek out promotions and better job opportunities so as to increase her income.' " *Id.* ¶ 15. It also continued the matter for a review of maintenance "at which time the court would 'increase, decrease or leave the same amount.' " *Id.* Following a second maintenance review, a different trial judge ordered the husband's maintenance obligation to terminate in 18 months. *Id.* ¶ 18. It found, in part, that the wife improperly "failed to take college courses/training to improve her earning capacity ***." *Id.*

¶ 60 On appeal, the Second District found the trial court at the second maintenance review "failed to recognize the limited scope of review" and improperly faulted the wife for failing to pursue educational opportunities. *Id.* ¶¶ 30-31. Specifically, it held the trial court's November 2010 order provided "guidance as to what would be its concern at the next review" by directing

the wife to remain employed and seek out promotions and opportunities to increase her income. *Id.* ¶ 29. The Second District found the wife could reasonably interpret the trial court's directives "as the sole criterion by which the trial court, at the next review, would judge her efforts toward self-sufficiency." *Id.* It also concluded there was ambiguity in the trial court's November 2010 order and looked to comments that court made at a prior hearing that the wife had made "good-faith efforts by obtaining and continuing full-time employment" and setting forth its hope that she would advance in position with her current employer. *Id.* ¶ 30. The appellate court found "no requirement that [the wife] seek further education." *Id.* Accordingly, it vacated the trial court's judgment terminating maintenance and remanded for further maintenance review proceedings. *Id.* ¶ 32.

¶ 61        In this instance, we also find the supreme court's decision in *Blum*, a case relied upon in *Heasley*, is instructive. In *Blum*, 235 Ill. 2d at 25, the parties entered into a marital settlement agreement that provided the former husband would pay his former wife unallocated maintenance and child support for 61 months and stated that maintenance was "reviewable" after a specified date. "Under a separate provision within the same section of the marital settlement agreement, [the wife] agreed to make 'reasonable efforts to become economically self-sufficient.' " *Id.* On review, the supreme court acknowledged that "[t]he factors set forth in section 510(a-5) [of the Dissolution Act] are inapplicable when the parties have otherwise agreed on the terms of modification and termination of maintenance in a written marital settlement agreement approved by the court[.]" *Id.* at 32. However, when viewing the parties' agreement as a whole, the court found "that the parties agreed to a general review of maintenance." *Id.* at 35.

¶ 62        We find the circumstances of the present case more similar to *Blum* than *Heasley*. As stated, the parties' marital settlement agreement was set forth in the dissolution judgment.

Paragraph 7 of the judgment specifically provided that the parties had "entered into an oral settlement agreement as established by testimony in open court, which agreement is approved and adopted by the court, and the particulars hereinafter set out." A series of lettered paragraphs then followed, setting forth the various agreements of the parties. In paragraph C, the judgment set forth Jeffrey's child support and maintenance obligations and provided that "maintenance shall be reviewed after January 17, 2005." A separate lettered paragraph, paragraph E, set forth Elizabeth's continuing obligation to find employment.

¶ 63    We find nothing in the language of the parties' agreement limiting maintenance review. There were no explicit agreements regarding the terms of modification or termination of maintenance and nothing suggesting Elizabeth's obligation to find employment as set forth in paragraph E would be the sole factor upon which maintenance could be altered in the future. As discussed, the language in paragraph E of the dissolution judgment indicates the agreed-upon maintenance was rehabilitative. However, an award of rehabilitative maintenance does not necessarily require a limited scope of review.

¶ 64    Under the circumstances presented, we find this case is more factually similar to what occurred in *Blum*. Like in that case, the record here reflects the parties agreed to a general review of maintenance and, thus, a consideration of the various factors set forth in sections 504(a) and 510(a-5) of the Dissolution Act by the trial court was permissible.

¶ 65    Again, Elizabeth also argues the trial court erred by finding the parties' marital settlement agreement required her to find full-time employment as a teacher rather than just "remain employed." We note, however, that "[r]ehabilitative maintenance is intended to assist and encourage dependent spouses to become financially independent." *Van Hoveln*, 2018 IL App (4th) 180112, ¶ 30. "The policy underlying rehabilitative maintenance is to sever the financial ties

between a former married couple in an expeditious, but just, manner and make each spouse independent of the other as soon as practicable." *In re Marriage of Cantrell*, 314 Ill. App. 3d 623, 628, 732 N.E.2d 797, 801 (2000). "[T]here is an affirmative obligation on a former spouse receiving rehabilitative maintenance to find appropriate employment" and "[r]ehabilitative maintenance requires a continuing effort by [the payee spouse] to become self-sufficient." *In re Marriage of Courtright*, 229 Ill. App. 3d 1089, 1091, 595 N.E.2d 619, 620 (1992).

¶ 66        Here, in setting forth its maintenance ruling, the trial court stated as follows:

> "I agree nowhere in the order or the docket entry does it say [Elizabeth] has to get a teaching job, but there is this underlying principle that parties should try to work to the best of their ability ***. But with a teaching degree, I think it was expected that she would find a job comparable to what she could get at least as a teacher; if not, she would be considered voluntarily underemployed[.]"

We agree with the court's determination that the parties' agreement required Elizabeth to maximize her employment potential.

¶ 67        As discussed, the terms of the marital settlement agreement provided for rehabilitative maintenance. Therefore, Elizabeth had an obligation to make a continuing effort to become self-sufficient and financially independent. On appeal, she interprets the parties' agreement to only require her to "remain employed." However, that interpretation would do little to further the intended purposes of rehabilitative maintenance. Additionally, that interpretation is contrary to what Elizabeth testified was her actual understanding of the parties' agreement. Specifically, the record shows Elizabeth acknowledged that per the dissolution judgment, it was anticipated that she would find employment and that she "would be looking for a teaching job."

¶ 68        Accordingly, we find no error in the trial court's determination that the parties'

marital settlement agreement required Elizabeth to not just work, but "work to the best of [her] ability" and with an eye toward becoming financially independent. Nor do we find it was error for the court to find that working to the best of her ability meant that Elizabeth, who had a teaching degree, would attempt to find work comparable to that of a full-time teacher.

¶ 69                                 3. *Maintenance Termination*

¶ 70          On appeal, Elizabeth also contends that the evidence presented to the trial court demonstrated her continued need for spousal support and did not warrant termination of Jeffrey's maintenance obligation. We note "[a] trial court's decision to modify maintenance upon conducting a review of maintenance will not be disturbed absent a clear abuse of discretion." *Blum*, 235 Ill. 2d at 36. "A clear abuse of discretion occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *Id.*

¶ 71          Here, in terminating Jeffrey's maintenance obligation, the trial court considered relevant statutory factors and relied heavily on its finding that Elizabeth failed to make reasonable efforts to become self-sufficient. See *Courtright*, 229 Ill. App. 3d at 1091 ("If one fails to make a good faith effort to become self-sufficient, a court may terminate rehabilitative maintenance."). We find no abuse of discretion in the court's determinations.

¶ 72          The record shows that in 2002, Elizabeth agreed she was obligated to find employment and that such an obligation might even require a move for herself and the children. Although Elizabeth asserts on appeal that she made substantial efforts to find employment and "secure higher paying positions," she fails to cite to any portion of the record in the argument section of her brief that describes such efforts. Our own review of the record shows she acknowledged that she did not begin looking for work outside the home until 2007, when the

- 22 -

parties' youngest child was in kindergarten. The record further shows only brief and general testimony regarding Elizabeth's efforts to either find employment within her field or to maximize her earning potential during the 17-year period between the parties' divorce and Jeffrey's initial motion to terminate maintenance.

¶ 73        Elizabeth complains that the trial court improperly faulted her for leaving a teaching position earning only $36,000, a sum which she asserts "could not sustain a standard of living near the standard that she would have enjoyed had the parties' marriage not ended" and would still have warranted a finding that maintenance should continue. We note, however, that it is the standard of living the parties enjoyed during the marriage that is the appropriate benchmark for maintenance considerations, not Jeffrey's current standard of living or the standard of living she would have had if the parties remained married. See *Price*, 2013 IL App (4th) 120155, ¶ 30. Here, the record reflects Jeffrey earned substantial income at the time of the underlying review proceedings. However, he earned significantly less money during the marriage and was the sole source of financial support for the parties and their children. The record reflects the parties lived comfortably but not lavishly. By the time of review, the parties' children had reached the age of majority and Elizabeth only had herself to support. As the court determined, she would need less income than the parties had during the marriage to approximate their same standard of living.

¶ 74        Additionally, the trial court did not solely find a lack of reasonable efforts by Elizabeth based on her decision to quit her $36,000 per year teaching position. Instead, it found Elizabeth had agreed in 2002 to go back to work "and possibly move if she had to." It stated the "flaw" in Elizabeth's argument that her earnings were impaired was that she "was to be looking for a job 16 years ago" and it stated as follows:

"I think had she found a job 15, 14, 13, 12 years ago as a teacher, at least when all

- 23 -

the children are old enough to be in school and maintain that job her salary would be substantially more than what she is arguing is the best she could get right now."

¶ 75 Evidence in the case otherwise showed the parties were married for just under 10 years when the petition for dissolution of marriage was filed. Elizabeth was awarded the marital residence following the divorce, which she sold for a profit. She bought a more valuable residence with a fair market value of $219,000, in which she held a significant amount of equity. She had retirement assets and testified that with her current income was "[m]aking ends meet" and "keeping [her] bills paid." The trial court determined she had sufficient resources to pay for her expenses, and we find no error in that determination.

¶ 76 Ultimately, we find the record contains support for the trial court's findings. Its decision to terminate maintenance was not an abuse of discretion.

¶ 77 B. Child Support

¶ 78 1. *Stock Cash Awards as Child Support*

¶ 79 On appeal, Elizabeth further argues the trial court erred by denying her first amended petition for indirect civil contempt, alleging Jeffrey's failure to pay, or his underpayment of, child support. Initially, we note she contends the court erred in denying her contempt petition based on Jeffrey's alleged failure to pay 40% of his net stock cash awards (also referred to by Elizabeth as "long term incentive cash payments"). Elizabeth argues the parties' marital settlement agreement required Jeffrey to pay 40% of his "net annual bonuses" as child support. According to her, that language referred to "any bonus" Jeffrey received from his employer, including cash awards from exercising his "stock options." She maintains the court erred in finding the parties' agreement was ambiguous on that point and that, ultimately, Jeffrey's child support obligation as set forth in the agreement did not require him to pay 40% of the net stock cash awards he received

from 2004 to 2020 (amounting to an arrearage of $470,000).

¶ 80      As already stated, "[a] marital settlement agreement is construed in the manner of any other contract[.]" *Blum*, 235 Ill. 2d at 33. When the terms of the agreement are unambiguous, the parties' intent must be determined "solely from the instrument's plain language." *Culp*, 399 Ill. App. 3d at 547. "An agreement is unambiguous when it contains language susceptible to only one reasonable interpretation." *Id.* However, when the agreement's terms are ambiguous, parol evidence may be used to ascertain the parties' intent. *Farrell*, 2017 IL App (1st) 170611, ¶ 12. Ultimately, "[t]he interpretation of a marital settlement agreement is reviewed *de novo* as a question of law." *Blum*, 235 Ill. 2d at 33.

¶ 81      Regarding child support, the parties' marital settlement agreement provided that in addition to a fixed amount of child support paid every two weeks, Jeffrey was required to "pay as and for child support 40% of his net annual bonuses." The trial court found the language ambiguous, stating as follows:

> "The issue is what is the annual bonus. It does say bonuses, but I mean just the very nature that it was going to happen more than I suppose if [the parties] had one child who is 17 and there is only going to be one payment for one year, it would be clear it would say [a percentage] of his net annual bonus and it's going to terminate next year. So the mere fact that there's going to be at least two years of payments, if not 17, there is [*sic*] going to be *bonuses*.
>
> Annual can mean—when I first think of it, I think, well, it happens once a year, but it can also mean, arguably continuing throughout the year. When you talk about annual rainfall or snowfall in a particular area that doesn't happen once a year, it happens throughout the course of the year. So that is an ambiguity of this

contract." (Emphasis added.)

¶ 82      Here, we find no error in the trial court's determination that the parties' agreement was ambiguous. The agreement provided no specifics regarding what the parties considered a "bonus" or to what specific bonus or bonuses of Jeffrey's it was referring. The phrase "net annual bonuses" could be interpreted as referring to a single bonus received once a year but viewed over the course of multiple years or it could refer to any bonus Jeffrey received within a year's time frame. The language of the agreement is susceptible to more than one reasonable interpretation and, thus, it was not error for the court to consider evidence outside the parties' contract to determine their intent.

¶ 83      We note that in setting forth its ruling that the agreement contemplated only Jeffrey's AIP bonus, the trial court pointed out that for much of the time Jeffrey was paying child support, he was subject to an order of withholding. It noted "there was a withholding order submitted to his employer using the exact wording of the agreement" and it was the employer that, based on the language in the agreement, withheld only amounts associated with Jeffrey's AIP bonus, not cash awards from any stock incentives he later received. The court also found the evidence showed Jeffrey was only receiving one annual bonus, the AIP bonus, at the time the parties' agreement was entered into. Finally, the record reflects the court relied on the fact that the agreement was drafted by Elizabeth's counsel. That finding is not disputed on appeal and we note that ambiguities in a marital settlement agreement may be construed against the party who drafted it. *In re Marriage of Kuyk*, 2015 IL App (2d) 140733, ¶ 19, 40 N.E.3d 822.

¶ 84      Under the circumstances presented, we find no error in the trial court's determination that the parties' marital settlement agreement referenced only Jeffrey's AIP bonus, and not the stock cash awards he later began receiving from his employer.

¶ 85                2. *Jeffrey's Failure to Pay 40% of his AIP Bonus for 2020*

¶ 86           On appeal, Elizabeth next challenges the trial court's rulings with respect to Jeffrey's failure to immediately pay 40% of his net AIP bonus that he received in 2020. However, we find her claims are forfeited due to her noncompliance with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 87           "[T]he appellate court is not a depository in which the appellant may dump the burden of argument and research." *First Mercury Insurance Co. v. Nationwide Security Services, Inc.*, 2016 IL App (1st) 143924, ¶ 21, 54 N.E.3d 323. Instead, "a reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented." *Id.* To that end, Rule 341(h)(7) provides that the argument section of an appellant's brief "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on."

¶ 88           This court has stated that "[s]trict adherence to the requirement of citing relevant pages of the record is necessary to expedite and facilitate the administration of justice." *Maun v. Department of Professional Regulation*, 299 Ill. App. 3d 388, 399, 701 N.E.2d 791, 799 (1998). Further, a contention that is supported by some argument, but no authority does not meet the requirements of Rule 341 and is considered forfeited. *Crull v. Sriratana*, 388 Ill. App. 3d 1036, 1045, 904 N.E.2d 1183, 1190-91 (2009); see also *Marsh v. Sandstone N., LLC*, 2020 IL App (4th) 190314, ¶ 50, 179 N.E.3d 402 (stating the failure to cite legal authority to support a claim results in forfeiture of the issue on review).

¶ 89           Here, in paragraphs C and E of the argument section of her brief, Elizabeth contends the trial court erred by (1) refusing to hold Jeffrey in contempt for failing to immediately pay child support associated with his 2020 AIP bonus and (2) improperly reducing the amount Jeffrey owed

in connection with that bonus from 40% to 20%. However, within paragraph C, Elizabeth cites to no page of the appellate record, nor to any legal authority to support her claims. In paragraph E, she also cites no legal authority and her sole citation to the appellate record regarding these issues is to a portion of the trial court's docket entry, which provides no support for the specific factual contentions she raises on appeal. Accordingly, Elizabeth's arguments are deficient, and her claims of error have been forfeited.

¶ 90 Forfeiture aside, we note the record actually refutes Elizabeth's contention that the trial court reduced Jeffrey's child support obligation for his 2020 AIP bonus from 40% to 20%. In setting forth its oral ruling on the motion, the court stated it "sided" with Elizabeth regarding the amount owed and stated Jeffrey's 2020 bonus would be calculated "at the 40[%] rate ***." The record further reflects the court's calculations were in line with that rate, showing it determined Jeffrey owed $22,696.42, rather than the $11,662.60 figure alleged by Elizabeth on appeal.

¶ 91 3. *Interest on Child Support Arrearages*

¶ 92 Finally, regarding child support, Elizabeth also contends the trial court erred by failing to award her statutory interest on Jeffrey's child support arrearages.

¶ 93 Section 505(b) of the Dissolution Act provides that "[a] support obligation, or any portion of a support obligation, which becomes due and remains unpaid as of the end of each month *** shall accrue simple interest as set forth in Section 12-109 of the Code of Civil Procedure [(Code)]." *Id.* Section 12-109(b) of the Code states:

> "Every judgment arising by operation of law from a child support order shall bear interest as provided in this subsection. The interest on judgments arising by operation of law from child support orders shall be calculated by applying one-twelfth of the current statutory interest rate as provided in Section 2-1303 to

the unpaid child support balance as of the end of each calendar month." 735 ILCS 5/12-109(b) (West 2018).

Additionally, section 2-1303 of the Code (*id.* § 2-1303) provides that "judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied." Interest on past-due child support payments is mandatory. *Illinois Department of Healthcare & Family Services ex rel. Wiszowaty v. Wiszowaty*, 239 Ill. 2d 483, 488, 942 N.E.2d 1253, 1256 (2011).

¶ 94　　　　Here, Elizabeth requested the trial court calculate interest on Jeffrey's past due child support payments. The court denied that request, stating it did not believe it would be "equitable." It noted Jeffrey's employer stopped withholding child support from his pay in 2018 and Jeffrey "made a reasonable effort" to pay the appropriate amounts due in 2018 and 2019. Additionally, the court relied on the pending litigation regarding the amount of Jeffrey's 2020 AIP bonus to find that an award of interest on that arrearage would be "unfair." However, as stated, interest on unpaid child support is mandatory. The trial court acted without authority in refusing Elizabeth's request and failing to calculate the statutory interest on Jeffrey's unpaid child support.

¶ 95　　　　We note that in challenging Elizabeth's request for statutory interest, Jeffrey first argues interest was not required because he overpaid on other support obligations, including maintenance, his fixed child support obligation, and medical expenses. However, he cites no legal authority to support his contention and we find no such exceptions in the statutory language. Jeffrey additionally argues that because his arrearages stemmed from an order that he pay a percentage, rather than a fixed, amount of his bonus, "the actual amounts were not determined until the [trial] court" entered its ruling below in May 2021. Again, we disagree. The evidence indicated Jeffrey received his AIP bonuses near the beginning of each year and thereafter paid his

percentage child support obligation. In particular, he received his 2020 AIP bonus in February 2020. Jeffrey should have known at that time the amounts due under the parties' prior agreement.

¶ 96                          C. Contribution to Attorney Fees

¶ 97          Finally, on appeal, Elizabeth argues the trial court abused its discretion by ordering Jeffrey to pay only one-fifth of her reasonable attorney fees. She points to the disparity in the income of the parties and the fact that she used an inheritance to pay a portion of the attorney fees she owed. Elizabeth asks this court to increase the amount Jeffrey is required to contribute to her attorney fees to 50% of her reasonable fees.

¶ 98          The Dissolution Act provides that "[t]he court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees." 750 ILCS 5/508(a) (West 2018). Specifically, attorney fee awards may be made in connection with the enforcement or modification of any order or judgment under the Dissolution Act. *Id.* § 508(a)(2). Under section 508(a), "[t]he trial court must (1) 'consider[ ] the financial resources of the parties' and (2) make its decision on a petition for contribution 'in accordance with subsection (j) of Section 503.' " *In re Marriage of Heroy*, 2017 IL 120205, ¶ 19, 89 N.E.3d 296 (quoting 750 ILCS 5/508(a) (West 2014)). Section 503(j)(2) of the Dissolution Act, in turn, provides that "[a]ny award of contribution to one party from the other party shall be based on the criteria for division of marital property under this Section 503 and, if maintenance has been awarded, on the criteria for an award of maintenance under Section 504." 750 ILCS 5/503(j)(2) (West 2018).

¶ 99          Under section 508, "[t]he party seeking an award of attorney fees must establish her inability to pay and the other spouse's ability to do so." *In re Marriage of Schneider*, 214 Ill. 2d 152, 174, 824 N.E.2d 177, 190 (2005). "[A] party is unable to pay if, after consideration of all

the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine his or her financial stability." *Heroy*, 2017 IL 120205, ¶ 19. "The circuit court's decision to award attorney fees will not be disturbed absent an abuse of discretion." *Id.* ¶ 13.

¶ 100 Here, before the trial court, Elizabeth alleged she owed attorney fees totaling $45,863.50. She asserted the fees were reasonable and she lacked the ability to pay. The court concluded Elizabeth had "some ability to pay attorney fees," noting her equity in her residence. It also considered its previous findings that she was "substantially underemployed" and had the ability to work. Nevertheless, the court ordered Jeffrey to contribute to Elizabeth's fees in the amount of $9172.70—representing one-fifth, or 20%, of the amount she currently owed—finding Elizabeth did not have the ability to pay the full fee amount "without substantially affecting her ability to live."

¶ 101 On appeal, Elizabeth does not argue that the trial court considered any improper factors. In asserting error, she relies solely on the parties' disparate income and the fact that she paid a portion of the fees she owed with an inheritance. We find the record reflects the court properly considered the parties' financial circumstances and that Elizabeth's contentions on appeal fail to establish an abuse of discretion.

¶ 102 We note Elizabeth additionally suggests that an award of attorney fees would have been proper under section 508(b) of the Act based on Jeffrey's unpaid or underpaid child support obligations. That section states as follows:

"In every proceeding for the enforcement of an order or judgment when the court finds that the failure to comply with the order or judgment was without compelling cause or justification, the court shall order the party against whom the proceeding is brought to pay promptly the costs and reasonable attorney's fees of the prevailing

party." 750 ILCS 5/508(b) (West 2018).

¶ 103 Here, there was no finding by the trial court that Jeffrey failed to comply with an order or judgment without a compelling cause or justification. We note the court declined to hold Jeffrey in contempt based on the nonpayment or underpayment of his child support obligations. As noted above, Elizabeth provided a deficient argument in challenging the court's contempt ruling on appeal and forfeited her claim of error as to that issue. Her arguments regarding section 508(b), based on alleged unjustified conduct by Jeffrey, are similarly deficient. Accordingly, we find no error by the court.

¶ 104                                        III. CONCLUSION

¶ 105 We commend the trial court judge in this case for the detailed oral ruling he provided at the conclusion of the evidentiary hearings, which aided our review of the issues presented. For the reasons stated, we reverse the trial court's denial of Elizabeth's request for statutory interest on Jeffrey's unpaid child support and remand for a calculation of the interest owed. We otherwise affirm the trial court's judgment.

¶ 106 Affirmed in part, reversed in part; cause remanded.