**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230307-U

Order filed August 6, 2024

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| JEFF MATTSON, | ) | Du Page County, Illinois, |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | Appeal No. 3-23-0307 |
| and | ) | Circuit No. 14-D-1499 |
| | ) | |
| CHRISTINE MATTSON, | ) | Honorable |
| | ) | Maureen R. Riordan, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice McDade and Justice Albrecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the trial court's denial of the former husband's petition to terminate maintenance. Affirmed.

¶ 2    Petitioner, Jeff Mattson, petitioned to terminate his maintenance obligation to respondent, Christine Mattson. A self-represented litigant at trial, he argued that Christine cohabitated with a new partner pursuant to section 501(c) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/510(c) (West 2022), and that Christine had not made a good-faith

effort to become self-supporting. The trial court granted Christine's motion for a directed finding on the issue of cohabitation. See 735 ILCS 5/2-1110 (West 2022). The trial court subsequently denied Jeff's motion to terminate in its entirety. Jeff, who is represented by counsel on appeal, addresses both alleged grounds for termination as well as an evidentiary ruling concerning text messages. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In 2016, Jeff and Christine divorced after 23 years of marriage. They had two children, ages 15 and 17. For most of the marriage, Jeff worked as an attorney and Christine stayed at home with the children.

¶ 5        The trial court approved the parties' marital settlement agreement, which provided that the marital estate, worth approximately $1.75 million, be split 60/40 in favor of Christine. The estate included a 5500-square-foot marital residence in Glen Ellyn, which sold in 2016 for approximately $1.5 million. The agreement also provided for unallocated family support and, later, permanent maintenance:

> "5.1 Commencing upon the fifteenth day of January 2016 and continuing on the first and fifteenth day of each month thereafter for a total of sixty (60) months (*i.e.*, through and including January 1, 2021), and based upon current conditions, Jeff shall pay directly to Christine forty-two percent (42%) of his gross income from all sources of employment as unallocated family support. *** Upon Jeff's last payment of said support, Jeff shall pay directly to Christine thirty percent (30%) of his gross income from all sources of employment as and for permanent modifiable maintenance[.]
>
> ***

2

5.3 Said unallocated family support and permanent maintenance payments shall terminate upon the first to occur of the following events:

A. Christine's death;

B. Jeff's death;

C. Christine's remarriage;

D. Christine's cohabitation with another person on a resident, continuing, conjugal basis; or

E. The termination of Jeff's maintenance obligation to Christine as adjudicated by a court of competent jurisdiction upon proper notice and petition by Jeff.

\*\*\*

5.5 \*\*\* The aforesaid unallocated family support and permanent maintenance payments are deductible by Jeff \*\*\* and includable on the income of Christine \*\*\*.

\*\*\*

5.7 Christine shall have the affirmative obligation to make a good faith effort to become self-supporting pursuant to Section 510(A-5)(2) of the Illinois Marriage and Dissolution of Marriage Act."

¶ 6    Jeff paid the following unallocated family support and maintenance amounts: $115,000 in family support in 2018; $133,000 in family support in 2019; $212,000 in family support in 2020; $126,000 in maintenance in 2021; and $121,000 in maintenance in 2022. Jeff filed a two-count complaint for termination of maintenance based on: (1) Christine's cohabitation with Jeff Joniak (Joniak) on a resident, continuing, conjugal basis; and (2) Christine's lack of good-faith effort to become self-supporting.

¶ 7        At trial, Jeff introduced evidence addressing each basis. For convenience, we first set forth the evidence pertaining to cohabitation, which culminated in the trial court's directed finding in Christine's favor. We then set forth evidence pertaining to Christine's efforts to become self-supporting.

¶ 8                    A. Evidence and Ruling Pertaining to Cohabitation

¶ 9                                1. Jeff Mattson

¶ 10       Jeff testified in the narrative. Jeff used his sister's Facebook account to view Christine's Facebook page. He later sent Christine a friend request, which she accepted. Jeff's initial intent in participating in Facebook was to see what was "going on" with his children. However, he started noticing posts concerning Joniak. This prompted him to drive by Christine's house in the middle of the night. He did this approximately 20 times in 2018 and 2019, when the children were away at college. More than 10 times, he saw a car in Christine's driveway that he did not recognize or that he had seen before in Joniak's driveway. This, in turn, prompted him to hire two private investigators.

¶ 11       Through stipulation and testimony, evidence from the private investigators supported that they performed surveillance 37 nights and mornings between September 2019 and November 2020, excluding the summer months when the children were home from college. Based on cars parked in the driveway, the investigators concluded that the new couple was together 62% of nights. Jeff also called the rental manager at Schaumburg Toyota to testify that the cars photographed in Christine's driveway had been leased by Joniak.

¶ 12                               2. Jeff Joniak

¶ 13       Joniak testified that, in 2016, he and Christine went on their first date. In mid-2017, they considered themselves an exclusive couple. That is when he introduced Christine to his daughters,

4

who were around the same age as Christine's children. He has met Christine's parents, and he has gone out to dinner with them on one occasion when Christine was not present.

¶ 14    Joniak testified to his 800-square-foot rental residence located on Western Avenue near downtown Glen Ellyn. Prior to living there, he had lived in the Wheaton Tower Apartments and prior to living at the Wheaton Tower Apartments he had lived in his marital residence in Wheaton. Joniak entertains friends in his Glen Ellyn home with some frequency but less than 10 times per year. His young adult daughters stay in his home when they are in town. Joniak is a "gardening fanatic," maintains potted plants, and takes care of his yard. He has dedicated office space. Elsewhere, the record establishes that the home has a bedroom, family room, dining room, kitchen, office, bathroom, and small garage. It rents for approximately $2000 per month.

¶ 15    Joniak testified that, when either his or Christine's children were *home from college* during the summer months or on holiday, he and Christine did not stay at one another's homes:

> "Q. *** [H]ow often do you and Christine sleep together?
>
> A. I'm going to say—this is a blanket statement. 95 percent of the time I sleep by myself, so it's infrequent.
>
> ***
>
> A. In the entirety of the relationship, it's been infrequent. *** I have no idea how to give a number or an average or anything like that, other than I'm very confident that in the entirety of the relationship 95 percent of the time I sleep alone.
>
> ***
>
> Q. *** [W]hile [the children] were *in college*, can you make a similar estimate as to how often you and Christine would sleep together?

5

A. I can't in terms of, again, how many times a week or whatever. But to me, to my recollection, it's infrequent." (Emphasis added.)

¶ 16    Joniak testified that, if Christine's car was in his driveway, she was probably there. However, the reverse was not true. Joniak occasionally left his car in Christine's driveway when he went away on work trips for his job as a Chicago Bears sportscaster. He explained that his car did not fit in his garage and that "I have a black walnut tree in my yard, so it drops black walnuts and dents vehicles I don't own, so if I left to go on trips to cover [NFL] events ***, I would often park the car in Christine's driveway for several days, up to a week." Also, his car could be seen some early mornings in Christine's driveway because, when football is not in season and the weather is nice, he and Christine walk together for exercise. Joniak drives his car to Christine's house early to mid-morning and they begin a six- or seven-mile walk. As of his December testimony, he had not been on a walk with Christine since September.

¶ 17    Joniak spends a lot of time at work. During mid-July to mid-February football season, he drives to Hallas Hall nearly every day. He leaves between 7:30 a.m. and 9:30 a.m. and returns as late as midnight. During the off-season, he continues to commute to Chicago for sportscasts.

¶ 18    Joniak does not believe he has done "chores" at Christine's house; however, he has gardened, raked leaves, and shoveled snow on occasion. Christine has used a key hidden outside his house to get inside his house a "couple" of times. Conversely, he does not recollect ever having the key code to Christine's house. When his washer was broken, Christine did his laundry. On a "couple" of occasions, Christine took his clothes to the cleaners.

¶ 19    Joniak and Christine attended events together. In September 2019, Joniak was inducted into the Chicago Alliance Sports Hall of Fame. His employer bought a table for the event and Christine was included at the table, as were his parents, uncles, and cousins. Christine's parents

6

also attended the event. Joniak's children did not attend the event, because they were away at college. Joniak introduced Christine to his colleagues at this and other events. Joniak testified consistent with Christine as to other special occasions and holidays as set forth below.

¶ 20    Joniak does not discuss finances with Christine. He has "no idea" how much money she has in her investment accounts. He has "no idea" how much money Christine receives in maintenance payments. He has never talked to her about her efforts to get a job.

¶ 21    During cross-examination, Joniak testified that he did not share any financial accounts, lines of credit, leases, or investments with Christine. He did not regularly transfer funds to her. Elsewhere, the record establishes that Joniak transferred a total of $2,350 to Christine for various gifts over six years.

¶ 22                                  3. Christine

¶ 23    Christine testified that her relationship with Joniak was "exclusive," but qualified: "I mean, this is the thing. We never said to each other you can't date someone else, I can't date someone else. I don't feel like that was something ever said. I feel like if he wanted to date someone else, I couldn't say no." She further explained, "I feel like it's one of those relationships anybody can leave at any time, sadly."

¶ 24    Christine testified that, after the divorce, she purchased a smaller Glen Ellyn home from her parents. The home is approximately 1300 square-feet, and the testimony indicates that it is 1800 square-feet if the basement is included. Jeff questioned Christine extensively about the size and layout of her house, where she kept separate bedrooms for her two children. After numerous questions, Christine's counsel objected on the ground of relevance. Jeff responded: "I'm going to argue that [Joniak's] house at 700 square-feet is a sham, a guise, he's really spending more of his time at her house and using her house as his own and that he's just doing that to maintain—for her

7

to maintain maintenance, so the size of her house being much more than his is relevant." The trial court sustained the objection as to subsequent questions concerning Christine's house.

¶ 25 The first year that Christine lived by herself in her new house, Joniak was more likely to stay overnight. Christine was "weirded out" by having to sleep by herself on the ground floor. It was the first time in her "entire life" she had ever lived by herself. Currently, however, Joniak was more likely to go home after dinner if he came over at all. Christine testified: "Like, right now, if he were to ever stop and have dinner, he's going home." Christine and Joniak do not sleep at each other's homes if their children are in town. They do not believe that is a proper example. Christine stated: "I mean, [my daughter] is living at home [now, in her first year after college], and I'm not having [Joniak] over." Even when the children were away at college, there was no set schedule: "I guess if he was around on a weekend and we were doing something, probably. *** It's honestly up to what his work schedule was. So, I don't know." Christine also testified: "I'm not saying he never stayed over, but I'm not saying—you know, there's no, like just because [the kids were away at college] now, all of a sudden, I'm seeing him constantly." When asked whether, over the relationship, she and Joniak spent more nights apart than together, Christine answered: "Absolutely, yes."

¶ 26 Christine corroborated Joniak's statement that Joniak occasionally left his car in her driveway when he was away on work trips. Further, Christine did not believe that Joniak's car was the only car in her driveway that Jeff and his private investigators may have attributed to Joniak. When Christine's mother visits from Florida, she rents a car and leaves it in Christine's driveway for as long as two weeks. Also, one photographed car attributed to Joniak belonged to Christine's daughter's friend.

8

¶ 27 Christine testified to numerous trips that she took since 2017, both with and without Joniak. An answer to an interrogatory showed that Christine took 66 trips between January 2017 and September 2022. About half of these trips included Joniak. Many of the trips with Joniak were out-of-state work trips paid for by Joniak's employer. Work trips included destinations such as London, the Dominican Republic, and Mexico. In February 2020, Christine and Joniak traveled to Europe in part to visit Christine's son who was traveling abroad. Several times, Christine and Joniak drove together to the college where both of their daughters were students. Christine stayed in her daughter's apartment on at least two of those trips. On other trips, Christine and Joniak shared a hotel room. Christine and Joniak spent time in Florida together, both with friends and with Christine's parents. Christine and Joniak also went on several trips with other couples. Often, another couple owned the out-of-state vacation home, so expenses were minimal. Christine approximated that she paid for 50% of expenses when traveling with Joniak, except when Joniak's employer covered the expenses.

¶ 28 Over the years, Christine spent portions of various holidays with Joniak. They spent several, but not all, New Years' Eves together. They spent at least one St. Patrick's Day together. One Easter, Christine met Joniak and his daughter for church and brunch. Joniak has given Christine a Mother's Day present. On several Fourth of Julys, the couple ran in the same road race, but not together. Sometimes, they watched the parade, attended a party, or watched the fireworks together. Other years, Christine went to a party while Joniak stayed back and watched the fireworks with his daughters. Christine and Joniak spent portions of two Thanksgivings together. One year, neither Christine's children nor her parents were available, so Christine asked Joniak "to do something." Another year, Christine dined with her son and his girlfriend's family. Joniak stopped by on his way home from work, but the meal had already concluded. Christine

spent other Thanksgivings with friends. Christine typically spent Christmas with her parents and children. However, due to COVID, her parents could not attend Christmas 2020. Therefore, Joniak and his daughters stopped over for a few hours and the group had hot chocolate. Regarding a second Christmas, Joniak stopped by a restaurant, where Christine had been celebrating with her parents and children, to say hello. Joniak did not join in the meal or have a drink. Instead, it was a short visit. Christine and Joniak exchange Christmas presents but usually exchange them on a day other than Christmas.

¶ 29        On two of Christine's Christmas cards over six years, she included a picture of Joniak. Each card featured four photos: one photo of Christine's daughter, one photo of Christine's son, one photo of the children together, and one photo of Christine and Joniak together. The cards' captions read "Tis the Season" and "Happy Holidays" and were signed Christine, daughter's name, and son's name. Joniak's name was not included.

¶ 30        Numerous Facebook posts were entered into evidence. Christine testified that she put the posts on Facebook; she accepted Jeff's friend request (allowing him to see her posts); and she was not trying to hide anything. Christine had become Facebook friends with some of Joniak's friends, but she "wouldn't call them up on the phone or anything." Christine captioned a 2018 Facebook photo of her and Joniak at a restaurant as "best date ever." She made a 2018 photo montage, which she captioned "just some random pictures of the ones I love." The set included the same picture of Joniak that had been in the "best date" photo. The set also included a trip she took with friends to visit her son in college and a high school photo of her daughter. In June 2018, Joniak posted a picture of Christine with the hashtag "my one and only." In January 2019, Christine posted a picture of herself and Joniak, writing that she wished "our" family and friends a happy new year.

In May 2019, Christine posted that she had such a great Mother's Day with her "family." The post included a picture of herself, Joniak, and her two children.

¶ 31 Regarding shared activities, Christine and Joniak have gone golfing, out for coffee, to movies, concerts, Cubs games, and socialized with mutual friends at each other's homes. Christine and Joniak texted every day. They ate breakfast together "here and there," meeting at the local diner. Christine and Joniak did not keep clothing at each other's homes.

¶ 32 Jeff questioned Christine regarding her 2016 communication with Scott T., the then-husband of Pam T., the woman with whom Jeff had had an affair. Scott reached out to Christine; they were both "devastated." They communicated at least once in person and also by text. They shared many emotions, anger being one of them. She did not recall every conversation with Scott, because it was "not a good time" in her life.

¶ 33                                   4. Pam T.

¶ 34 Pam T. testified that she and Jeff were dating in approximately 2016, when she observed texts on the computer screen located in the home office space that she shared with Scott. The text chain caught her eye, because the name "Christine Mattson" appeared. In the texts, Scott allegedly wrote, "The law is pretty clear though. [Pam] can actually live with Jeff most of the time and not get married and I still have to pay [maintenance]," and Christine allegedly replied, "Really. I'd like to know that for my own future."

¶ 35 Christine's counsel successfully objected, arguing insufficient foundation. The trial court agreed and stated that the name on the top of the text was hearsay:

> "[JEFF]: It's not a statement. It's a name ON the top of the text. Nobody has to say a statement there.
>
> THE COURT: It's hearsay."

11

¶ 36    Pam was nevertheless permitted to continue: "I was pretty surprised that my [ex]-husband was having conversations with your ex-wife[.]" Pam took a screenshot of the thread and showed it to Jeff that day. The trial court did not accept the screenshot as an exhibit. The following colloquy ensued:

> "[JEFF]: [The text messages cannot come in] [e]ven if I'm not using some of these texts to prove the truth of the statement's sake?
>
> THE COURT: Is the person who wrote the texts here on the stand?
>
> [JEFF]: No.
>
> THE COURT: All right. There's no foundation, so it's sustained on that basis. It is still hearsay assuming any of it is being used for the truth of the matter asserted and so it's sustained on that basis, as well."

¶ 37                              5. Christine Re-Called

¶ 38    Jeff re-called Christine, again asking her about the text messages. The following discussion took place:

> "THE COURT: *** You asked her about them previously. She didn't remember.
>
> [JEFF]: Okay. So I would like for the Court to reconsider admission of these texts on the following grounds. One, I think a sufficient foundation for the post was already laid by [Pam].
>
> THE COURT: How so?
>
> [JEFF]: Because she could identify that those were texts off of [Scott's] phone. [Christine] has testified that she has [texted] with Scott, and the texts themselves are labeled as being from Christine Mattson. I would also like to say that her statements are non-

12

hearsay as statements by a party opponent under Rule 801(d)(2) and that Scott's statements should be admitted under the rule of completeness, Rule 106[.]

THE COURT: Do you wish to respond?

[CHRISTINE'S COUNSEL]: You're right. She doesn't remember them. So there is nothing that ties in the statements from her. And then, *** from Pam's statements, we're talking about her looking at someone else's computer or phone of which she has no control over. She doesn't know how they label any of their contacts. She doesn't have any direct knowledge of the conversation so they couldn't lay a foundation through her to get them into evidence. ***.

THE COURT: There has been absolutely no foundation for those text messages. I could have put you [Jeff] in as Christine and texted you all those things and—[Christine's counsel] could have seen that on the computer screen, and we would be in the same position. We have absolutely no foundation for those. Pam took a snapshot of a computer screen of texts that Christine does not recall. The other party's statement would be absolute hearsay. Scott's not here to lay the foundation. So, respectfully, motion to reconsider is denied, and those exhibits are not coming in."

¶ 39    On April 13, 2023, the trial court granted Christine's motion for a directed finding as to cohabitation. It discussed *In re Marriage of Miller*, 2015 IL App (2d) 140530, extensively and, turning to the instant facts, explained:

"Here, Ms. Mattson and Mr. Joniak started dating in 2017. Over the course of the relationship, the parties have not commingled their finances. Neither has helped the other with housing costs [and only] minimally with household chores. Neither has keys to the other's house or car. Neither party has named the other as a beneficiary to any property,

13

financial accounts, or insurance policies. They have no joint memberships. They have no shared expenses. Neither party receives mail at the other's home. There was no evidence that either has assigned each other the Power of Attorney or beneficiary of a will. No evidence was presented that would support the idea that, should one party fall upon hard financial times, the other would step in to keep their respective lifestyles relatively even.

Numerous Facebook posts with photos of Ms. Mattson and Mr. Joniak were presented into evidence. As in *Miller*, the probative value of those posts is minimal. It is not remarkable that they held themselves out on Facebook to be a couple.

Much like *Miller*, the testimony and evidence presented reflects discrete blocks of time spent together, shared friends, many vacations, and some holidays spent together. Critically, however, the evidence also reflects an absence of evidence that there was ever any intention to make the relationship permanent. There was no commingling of finances. There is no shared household or household duties.

While there was evidence that they sometimes spend the night at each other's homes, the testimony was that they do not see each other every day. And Mr. Joniak credibly testified that 95 percent of the time he sleeps alone.

Of note here, there is an absence of certain traditional components of a marital relationship, such as intended permanence and mutual commitment, a shared day-to-day existence, and a partnership approach to the shared use and maintenance of material resources.

While Mr. Mattson has presented some evidence on every element essential to his cause of action, considering the totality of the evidence presented, the credibility of the witnesses, and the evidence favorable to Ms. Mattson, [there is] insufficient evidentiary

14

means for a *prima facie* case. And therefore, the motion for a directed finding as to [cohabitation] is granted."

The trial court denied the motion for a directed finding as to Christine's lack of good-faith effort to become self-supporting.

¶ 40                    B. Evidence and Ruling Pertaining to Self-Support

¶ 41    Christine testified that she graduated college in 1992, and she and Jeff married that same year. She worked outside the home between 1992 and 1998. First, she worked in Chicago as an account representative. Later, she and Jeff moved to Florida and purchased a magazine business, from which she earned $25,000 annually. She sold the magazine business in 1998, upon the birth of her son. During the marriage, Christine did not work outside the home. Occasionally, she worked for a "housing scout," who paid her $50 to take pictures of a given home.

¶ 42    Christine agreed that, since the divorce, she had not prepared a resume or applied for any jobs. She had not created a page on LinkedIn or spoken with a career counselor. Christine did not believe she was qualified to work in an office, because she had not "been around computers" in 25 years. She had not taken a class to improve her skills. She is 54 years of age, and no medical conditions impede her from seeking employment.

¶ 43    Christine has spoken with two friends about helping them with their interior design work. Those conversations occurred between one and three years prior to trial. Christine has never taken any interior design classes.

¶ 44    Christine did, however, make efforts to cut expenses. She lived in the 5500-square-foot marital residence for one year after the divorce but soon decided it should be sold, because she could not afford the mortgage, taxes, and maintenance. As she testified earlier, she moved into a more affordable 1300-square-foot residence. She cancelled her country club membership and

15

tennis lessons. Due to her downsizing efforts and with the maintenance payments, she has been able to make ends meet and provide a home for their daughter.

¶ 45    Jeff sought to impeach Christine in that, in the course of the instant proceedings, she reported on her financial affidavit that the value of her primary investment account was approximately $1 million when, in fact, it was approximately $1.2 million. Christine could not explain the discrepancy but stated that she was not trying to hide anything.

¶ 46    Jeff testified in the narrative that, in 2022, he began working at a new law firm: "I'm definitely making more money this year than I was making at [the prior firm]." On cross-examination, Jeff acknowledged that Christine's highest annual income has been $25,000 (not accounting for inflation). Jeff posited that Christine could work 40 hours per week at a minimum-wage job and earn $26,000 per year. When asked whether Christine earning "what she could earn before" would be a basis to terminate maintenance, Jeff answered: "[T]hat's a legal conclusion I have not researched."

¶ 47    In closing, Jeff argued:

> "The case law is clear, under both commercial contract law and marriage dissolution law. *** In the directed[-]finding motion, [Christine] attempted to confuse a [']recission claim,['] which I'm making here, with a modification claim. *** [Christine] would love a [motion for] modification because that would only reset maintenance [based on] an amount [Christine] could make now, completely excusing her [from her obligation to make efforts to become self-supporting]."

¶ 48    Christine responded that the marital settlement agreement set forth several occurrences that would cause maintenance to terminate automatically, and the failure to make a good-faith effort was not one of them. Christine also noted that Jeff cited cases involving rehabilitative, as opposed

16

to permanent, maintenance. Christine could not find any case law involving the termination of permanent maintenance based on a lack of good-faith effort to become self-supporting.

¶ 49    According to Christine, Jeff filed the "wrong motion." She contended that Jeff should have argued that "[Christine] should be working and I should get a modification." The parties already decided, in 2016, that Christine was not capable of attaining self-support at a level consistent with the marital lifestyle because it was agreed that she would receive permanent maintenance.

¶ 50    Jeff replied that a "recission," and not a modification, is his only remedy, because "by [Christine] not going out and getting employment, there hasn't been a substantial change in circumstances."

¶ 51    On May 31, 2023, the trial court issued a written ruling. The trial court recounted that paragraph 5 of the parties' marital settlement agreement awarded Christine "*permanent* modifiable maintenance." (Emphasis added.) Further, Christine had "the affirmative obligation to make a good faith effort to become self-supporting pursuant to [s]ection 510(a-5)(2) of the [Dissolution Act]."

¶ 52    The trial court declined to terminate maintenance based on Christine's lack of a good-faith effort to become self-supporting. It found:

> "Christine has not made any real effort to become self-supporting *by way of a job*. She testified that she has taken a few odd jobs, here and there, and would like to continue with those. She testified that she is 54 years old, has never been financially independent, and has not worked full time in over 20 years. The youngest child was emancipated in or around 2018, but continues to live with her a good deal of the time. Any job she realistically would be able to obtain would not provide her with an approximation of the same lifestyle she had during the marriage.

17

The only evidence as to any impairment of the earning capacity of either party is that Christine has not held employment in over 20 years, during the majority of those years she was a homemaker and took care of the parties' minor children.

\*\*\*

\*\*\* Christine testified that, following the divorce, she moved from an approximately 5500 square foot home to a 1300 square foot home. She also testified that, following the divorce, she gave up items such as a country club membership and tennis club, based on the expense of those items.

Jeff did not present any evidence or testimony that would indicate that his ability to pay maintenance has changed. Similarly, there was no evidence or testimony that supports a finding that Christine's needs have changed at all since entry of the JDOM." (Emphasis added.)

¶ 53 The court concluded: "Having considered the totality of circumstances, as analyzed under the section 504(a) and 510(a-5) factors of the Act, the court finds that [Jeff] has failed to show a substantial change in circumstances for purposes of *terminating* permanent maintenance. *No alternative relief was requested in Jeff's Amended Petition*." (Emphases added.)

¶ 54 This appeal followed.

¶ 55                                    II. ANALYSIS

¶ 56 On appeal, Jeff argues that the trial court's decision to deny his petition to terminate was against the manifest weight of the evidence and its refusal to admit Christine's text message to Scott T. was an abuse of discretion. For the reasons that follow, we reject Jeff's arguments.

¶ 57                                    A. Cohabitation

¶ 58 We first address the trial court's directed finding that Christine did not cohabitate with Joniak. Section 2-1110 of the Code of Civil Procedure allows a defendant in a non-jury case to move for a directed finding. 735 ILCS 5/2-1110 (West 2022). When ruling on a section 2-1110 motion, the trial court performs a two-step analysis. *Minch v. George*, 395 Ill. App. 3d 390, 398 (2009). First, the trial court determines as a matter of law whether the plaintiff has presented a *prima facie* case. *Id.* If the court determines that the plaintiff has presented a *prima facie* case, then the court proceeds to weigh all the evidence offered by the plaintiff, including evidence favorable to the defendant, to determine whether the *prima facie* case survives. *Id.* When a trial court directs a finding after weighing all of the evidence, we will reverse its finding only if it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence if the opposite conclusion is clearly apparent or if it is unreasonable, arbitrary, or not based on the evidence. *Miller*, 2015 IL App (2d) 140530, ¶ 40. Also, we defer to the trial judge in matters of witness credibility and discrepancies in the testimony. See *In re Marriage of Klose*, 2023 IL App (1st) 192253, ¶ 28.

¶ 59 Section 510(c) of the Dissolution Act provides that, "Unless otherwise agreed by the parties ***, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance *cohabits with another person on a resident, continuing conjugal basis*." 750 ILCS 5/510(c) (West 2022). (Emphasis added.) The statute ensures that a receiving spouse who is *de facto* married is treated no differently than a receiving spouse who is *de jure* married. *Miller*, 2015 IL App (2d) 140530, ¶ 40.

¶ 60 Prior to 2015, the appellate court districts—but not the supreme court—had utilized a non-exhaustive, six-factor test to determine whether the parties cohabitated per statute. *Id.* ¶ 47. The

factors were: (1) the length of the relationship; (2) the amount of time spent together; (3) the nature of activities engaged in; (4) the interrelation of personal affairs (including finances); (5) whether they vacation together; and (6) whether they spend holidays together. *Id.* ¶ 40. While that test was helpful, it drew from the circumstances that happened to be present in the case that developed it (*In re Marriage of Herrin*, 262 Ill. App. 3d 573, 577-78 (1994)) and was never intended to be *the* test to establish cohabitation. *Miller*, 2015 IL App (2d) 140530, ¶¶ 48-49. Key factors were missing or understated, such as whether and to what degree "the new couple exercise[d] a partnership approach to the acquisition, use, and preservation of material resources and income" as well as mutual commitment and intended permanence. *Id.* ¶¶ 55, 68 (citing *In re Marriage of Weisbruch*, 304 Ill. App. 3d 99, 105 (1999)).

¶ 61        To distinguish an intimate dating relationship from a *de facto* marriage, courts must consider not just the presence of facts informing each of the six factors but also whether those facts achieve a "gravitas akin to marital behavior." *Id.* ¶ 60. "Intimate dating relationships have companionship and exclusive intimacy, whereas marriage-like relationships, while likewise having companionship and exclusive intimacy (\*\*\* such that the former spouse does not engage in a similar relationship with a third person), also have a deeper level of commitment, intended permanence, and, unless reasonably explained, financial or material partnership (which would most commonly come in the form of a shared household)." *Id.* ¶ 61 (citing *In re Marriage of Sappington*, 106 Ill. 2d 456, 460 (1985) (the evidence supported that the new couple intended to share a household indefinitely) and *Weisbruch*, 304 Ill. App. 3d at 101-02 (the new couple intended permanence where the former wife planned to retire with her new partner, designated her new partner as her power of attorney for healthcare, and named her new partner the beneficiary of her will, over her children)).

¶ 62    Here, the trial court engaged in the proper analysis, weighing the traditional six factors, as well as the additional considerations set forth in *Miller* such as a shared household, a partnership approach to the acquisition and preservation of material assets, and commitment and intended permanence. Its conclusion that Christine and Joniak did not cohabitate was reasonable and based on the evidence. It stressed that Christine and Joniak: (1) did not share a household; (2) did not comingle finances; and (3) did not have the requisite degree of commitment to give their relationship the gravitas of a *de facto* marriage. The court recognized that Christine and Joniak had been in a lengthy, exclusive relationship (noting that they had been dating since 2017) and that they went on numerous vacations together. It also acknowledged the Facebook posts that Jeff had put into evidence. However, it chose to afford greater weight to Christine and Joniak's lack of requisite commitment, finding it "critical" that there was no evidence showing their intent to make the relationship permanent. Correspondingly, it chose to afford little weight to the Facebook posts, finding their probative value to be "minimal." The court did not act unreasonably in weighing the evidence in this manner.

¶ 63    For example, the *Miller* court explained that, because the statute provides that cohabitation must be "resident," the absence of a shared residence or shared housing resources is a "significant hurdle for a petitioner to overcome." *Id.* ¶ 64. Jeff attempts to overcome this hurdle by arguing that Joniak's Glen Ellyn rental was a "sham" and that, in reality, Joniak spent more than half of his nights with Christine. The trial court was not required to accept Jeff's view of the case. To the contrary, the evidence showed that the 800-square-foot rental house provided Joniak sufficient space to host his adult daughters, entertain friends, maintain designated office space, and garden. Joniak paid $2000 per month to live in the downtown Glen Ellyn house. Contrary to Jeff's position, the evidence does not establish that Joniak chose the location merely for its proximity to

21

Christine's house. Instead, the evidence shows that the location was within two miles of both Christine's house *and* Joniak's former marital residence. Further, the evidence shows that the location was independently desirable, in that it was proximate to the downtown festivities, restaurants, and the prairie path.

¶ 64    Similarly, the trial court was not required to accept Jeff's assertion that Christine and Joniak spent 62% of their nights together. The trial court was free to instead credit Christine and Joniak's testimony that Joniak left his car in Christine's driveway when he was away on work trips or parked there in the early morning to go on walks. The trial court expressly found credible Joniak's testimony that he spent most nights alone. The trial court's reference to Joniak's 95% estimate, which pertained only to nights when the children were away at college, does not undermine the court's general determination that Christine and Joniak generally did not spend the night together over the term of the relationship. Christine testified that Joniak spent the night less frequently as she became more comfortable living alone and that Joniak ceased to spend the night when her daughter moved back home.

¶ 65    As to the trial court's second point, Jeff does not even attempt to argue that Christine and Joniak comingled finances. As the court noted, Christine and Joniak did not name one another on financial accounts, insurance policies, or as beneficiaries in one another's wills. There was no evidence that Joniak would support Christine if she were to fall upon hard financial times. A partnership approach to the acquisition and preservation of material resources is a key component of most marital relationships (*Id.* ¶ 55), and the absence of that component in Christine and Joniak's relationship presents another obstacle for Jeff.

¶ 66    As to the trial court's third point, the trial court credited Christine's testimony that she and Joniak were not committed to making their relationship permanent. Christine testified that Joniak

22

was free to "walk away" from the relationship. The supporting evidence showed that, should he choose to do so, there would be no accounts, belongings, or housing resources to separate. Jeff argues that the court failed to adequately consider evidence that, on Facebook, Christine referred to Joniak as family, Christine and Joniak spent holidays together, and Christine and Joniak vacationed together. As to the Facebook posts, Jeff argues: "Christine repeatedly holding herself and Joniak as family (not merely a 'couple') may be the most important evidence here." The court's written order demonstrates that it *did* adequately consider this evidence, but it resolved discrepancies between the manner in which Christine represented the relationship on Facebook and her testimony in favor of her testimony. As to holidays, the evidence showed that Christine and Joniak did not always spend key family holidays together as a married couple would, with Joniak merely stopping by on a given Thanksgiving or on a Christmas when her parents declined her invitation due to COVID. That Christine and Joniak spent other holidays, such as New Year's Eve, St. Patrick's Day, and even Mother's Day, together and that Joniak joined Christine on approximately half of her many vacations did not require the court to find that they had entered into a *de facto* marriage.

¶ 67 Jeff points to several post-*Miller* cohabitation cases in which maintenance was terminated. See, *e.g.*, *In re Marriage of Churchill*, 2022 IL App (3d) 210026, ¶ 42 (denial of a petition to terminate maintenance reversed, with the appellate court explaining, *inter alia*, that the former spouse used her new partner's last name and the new couple "exchanged rings and have worn their respective rings on their left ring fingers."); *In re Marriage of Aspan*, 2021 IL App (3d) 190144, ¶ 17 (termination of maintenance affirmed where, *inter alia*, former spouse withdrew money from bank account to help pay for new partner's home, lived in the home full-time, and kept utilities in her name); *In re Marriage of Walther*, 2018 IL App (3d) 170289, ¶ 24 (denial of petition to

23

terminate temporary maintenance reversed where the former spouse had a conjugal relationship with the new partner at the time of the divorce; slept at the new partner's residence on a daily basis from May to November 2015, moving her daughter into the home; had free access to the new partner's house; stored and washed clothes at the new partner's house; purchased groceries and cooked for the new partner's family; took overnight trips with the new partner; and referred to a photograph of herself, her new partner, and their children as a "family"); *cf. id.* 39 (Carter, P.J., dissenting on the basis that the majority did not afford sufficient deference to the trial court's factual and credibility findings); *cf. In re Marriage of Edson*, 2023 IL App (1st) 230236, ¶ 184 (denial of petition to terminate maintenance affirmed; the "relationship was more akin to an intimate dating relationship, rather than a *de facto* marriage. The trial court agreed that [the petitioner] had sufficiently established the social and emotional aspects of a long-term, romantic relationship that involved both parties' families. However, on balance, it determined that the relationship lacked certain practical and economic characteristics, specifically with regard to their otherwise separate lifestyles and financial situations").

¶ 68 Although the above cases terminating maintenance have some facts in common with this case, they do not compel a different result. " 'Each case seeking a termination of maintenance based on the recipient spouse's conjugal cohabitation rests on its own unique set of facts,' [and we must keep] an eye toward preserving the trial court's primary position in assessing those unique facts." *Id.*, ¶ 118. Much of Jeff's argument rests on accepting his version of the facts, *i.e.*, that Joniak's separate household was a sham, that the new couple spent most nights together, and that the new couple spent most holidays together. However, the trial court expressly rejected those assertions. We defer to the trial court's credibility determinations, and we hold that its cohabitation decision is not against the manifest weight of the evidence.

24

B. Evidentiary Ruling

¶ 70            Jeff next argues that the trial court abused its discretion in refusing to admit the 2016 text messages between Christine and Scott T.  The parties agree that the content of the alleged texts concerned hypothetical cohabitation scenarios.  We review the trial court's evidentiary ruling for an abuse of discretion.  *Miller*, 2015 IL App (2d) 140530, ¶ 32.  A court abuses its discretion when no reasonable person would take its view.  *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 848 (2010).  Additionally, an erroneous evidentiary ruling requires reversal only if it substantially prejudiced the aggrieved party and affected the outcome of the case.  *Id.*

¶ 71            Just like other documentary evidence, text messages must be authenticated prior to admission.  *People v. Watts*, 2022 IL App (4th) 210590, ¶ 71.  "Authentication *** as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Ill. Rule Evid. 901(a) (eff. Jan. 1, 2011).  The evidence may be direct or circumstantial.  *Watts*, 2022 IL App (4th) 210590, ¶ 76.  The party seeking to admit the evidence need prove only a rational basis upon which the fact finder can conclude that the document was authored by the party alleged.  *Id.* ¶ 75.  "The trial court's finding of authentication is merely a finding there is sufficient evidence to justify presentation of the offered evidence to the trier of fact and does not preclude the opponent from contesting the genuineness of the writing after the authentication requirements are satisfied."  *Id.*

¶ 72            We acknowledge Jeff's point that there was *some* rational basis upon which the trier of fact could have found that the texts were authored by Christine and Scott.  In addition to the alleged authors, the information in the text messages could have been known to only a small group of people, Jeff and Pam, who were dating each other and were the respective ex-spouses referred to

in the text exchange. See *id.* ¶ 76. Pam testified that she observed the text on Scott's home office computer screen and took a screen shot of it.

¶ 73 Still, we cannot say that no reasonable person would have taken the trial court's view in excluding the evidence. Neither Scott nor Christine testified to the authenticity of the text exchange. Christine testified that she did not remember the particulars of her conversations with Scott, which occurred at a bad time in her life many years prior to the trial. The trial court noted that it was unclear who had labeled the alleged sender of the text to be "Christine Mattson."

¶ 74 Moreover, the 2016 texts at best demonstrate Christine's discussion with the equally distraught husband, Scott, of Jeff's paramour, about the legal parameters of cohabitation and maintenance. Given the trial court's credibility determinations, the texts' probative value as to Christine's *actual* conduct from 2018 to 2023 would have been minimal and there is not a reasonable probability that the outcome of the proceedings would have been different had the court admitted the texts into evidence.

¶ 75                                                     C. Self-Support

¶ 76 Jeff also appeals the trial court's decision not to terminate maintenance based on Christine's lack of good-faith effort to become self-supporting. Jeff has specified before the trial court and before this court that he does not seek a reduction in maintenance and, instead, seeks the all-or-nothing result of termination. To the extent Jeff's argument requires us to interpret the parties' marital settlement agreement, our review is *de novo*. *In re Marriage of Chapa*, 2022 IL App (2d) 210772, ¶ 36. However, the court's ultimate decision to deny Jeff's petition to terminate maintenance is reviewed for an abuse of discretion. *Id*. For the reasons that follow, we agree with the trial court's decision not to terminate maintenance because Christine's lack of effort to become

self-supporting by way of a job is but one factor to consider in deciding whether to terminate maintenance.

¶ 77     Preliminarily, we reject an argument Jeff made below and implicitly continues to make, *i.e.*, that this case can be decided outside the confines of the Dissolution Act and should instead be decided according to simple contract principles. Jeff argued below that he could not possibly meet the Dissolution Act's requirement that he prove a substantial change in circumstances, because the very condition of which he complained—that Christine failed to seek employment outside the home—was the status quo. Jeff's argument fails to recognize that a "substantial change in circumstances" is a term of art. For example, the case law holds that "the lack of a good-faith effort to achieve financial independence may, if proved, constitute the changed circumstanc[e]" required by the Dissolution Act. *In re Marriage of Lenker*, 241 Ill. App. 3d 15, 19 (1993).

¶ 78     Moreover, Jeff's argument that basic contract principles entitle him to a rescission of the maintenance provision is misplaced. Granted, section 502(e) of the Dissolution Act provides that marital settlement agreements are enforceable by all remedies available for enforcement of a judgment and are enforceable as contract terms. 750 ILCS 5/502(e) (West 2022). However, Jeff cites no case under the Dissolution Act where the remedy of rescission has been awarded to the non-breaching party to void a maintenance provision as though it never existed, nor has this court found one. Indeed, "the remedy of rescission generally requires each party to return to the other the value of the benefits received under the rescinded contract," and rescission is not appropriate "where the status quo ante cannot be restored." *Newton v. Aitken*, 260 Ill. App. 3d 717, 719-20 (1994). Jeff does not elaborate on how a return of benefits might be accomplished.

¶ 79     In any event, Jeff's allegation that Christine has "breached" paragraph 5.7 of the marital settlement agreement cannot be considered outside the confines of the Dissolution Act. The entire

marital settlement agreement was executed and approved under the authority of the Dissolution Act, and, moreover, paragraph 5.7 itself specifically provides that Christine's obligation to become self-supporting is to be measured against section 510(a-5)(2) of the Dissolution Act.

¶ 80　　　　Maintenance may be modified or terminated upon the movant's showing of a substantial change in circumstances and the court's consideration of the factors set forth in section 510(a-5), as well as the factors set forth in section 504(a) which informed the propriety of the initial maintenance award.  750 ILCS 5/510(a-5) (West 2022).  The factors set forth in section 510(a-5) are:

"(1) any change in the employment status of either party and whether the change has been made in good faith;

(2) the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate;

(3) any impairment of the present and future earning capacity of either party;

(4) the tax consequences of the maintenance payments upon the respective economic circumstances of the parties;

(5) the duration of the maintenance payments previously paid (and remaining to be paid) relative to the length of the marriage;

(6) the property, including retirement benefits, awarded to each party under the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage and the present status of the property;

(7) the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought;

28

(8) the property acquired and currently owned by each party after the entry of the judgment of dissolution of marriage, judgment of legal separation, or judgment of declaration of invalidity of marriage; and

(9) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/510(a-5) (West 2022).

¶ 81　　　　The factors set forth in section 504(a) are:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance as well as all financial obligations imposed on the parties as a result of the dissolution of marriage;

(2) the needs of each party;

(3) the realistic present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought;

(6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment;

(6.1) the effect of any parental responsibility arrangements and its effect on a party's ability to seek or maintain employment;

(7) the standard of living established during the marriage;

(8) the duration of the marriage;

(9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and the needs of each of the parties;

(10) all sources of public and private income including, without limitation, disability and retirement income;

(11) the tax consequences to each party;

(12) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(13) any valid agreement of the parties; and

(14) any other factor that the court expressly finds to be just and equitable."

¶ 82     The trial court was not required to consider Christine's lack of good-faith effort to become self-supporting to the exclusion of the other factors. In *Chapa*, for example, the appellate court determined that the receiving party's alleged failure to make efforts to become self-supporting was but one factor to consider when determining whether to extend maintenance. *Chapa*, 2022 IL App (2d) 210772, ¶ 39.

¶ 83     In this case, the non-exclusive weight given by the trial court to the self-supporting efforts factor is on even firmer footing. This case involves a permanent maintenance award, not a rehabilitative maintenance award. Indeed, none of the cases cited by Jeff wherein a court terminated maintenance based on a receiving party's failure to become self-supporting involved an award of permanent maintenance. See *In re Marriage of Courtright*, 229 Ill. App. 3d 1089, 1091 (1992) (trial court declined to extend the two-year maintenance term); *Marriage of McGory*, 185 Ill. App. 3d 517, 520-21 (1989) (court declined to extend the four-year maintenance term); *In re Marriage of Cunningham*, 2022 IL App (4th) 210494-U, ¶¶ 70-76 (declining to extend maintenance after a term where the paying party voluntarily exceeded the term).

30

¶ 84        Jeff acknowledges that he has cited cases involving rehabilitative maintenance. Citing to *In re Marriage of Dunseth*, 260 Ill. App. 3d 816, 833 (1994), he nevertheless observes that "even a spouse awarded indefinite maintenance has a good-faith obligation to work toward becoming self-sufficient." This may be true, but it does not establish that the failure to make a good-faith effort to become self-sufficient is the only factor to consider when ruling on a party's petition to terminate maintenance. Indeed, *Dunseth* itself, as well as the cases it cites, goes on to explain that other factors matter, and the court should consider not just the ability to support oneself generally but the ability to support oneself according to the standard of living established during the marriage. *Id.* (citing *In re Marriage of Pedersen*, 237 Ill. App 3d 952, 958 (1992); *In re Marriage of Carpel*, 232 Ill. App. 3d 806, 830 (1992); and *In re Marriage of Cheger*, 213 Ill App. 3d 371, 378 (1991)). Further, generally, when a receiving spouse is dilatory in efforts to become self-supporting yet is unlikely ever to achieve the lifestyle enjoyed during the marriage, the court should impute an income supported by the evidence and enter a corresponding reduction in maintenance rather than terminate maintenance. See *Carpel*, 232 Ill. App. 3d at 830.

¶ 85        Here, Jeff expressly stated that he did not seek a reduction in his maintenance obligation but sought termination only. The trial court made note of this in issuing its ruling. ("[Jeff] has failed to show a substantial change in circumstances for purposes of terminating maintenance. *No alternative relief was requested[.]*") (Emphasis added.) As such, we can be sure that the trial court did not disregard the evidence concerning Christine's failure to seek employment.

¶ 86        Instead, the trial court reasonably determined that the evidence did not warrant a termination in maintenance. As the evidence showed, Christine had a college degree but had not worked full time in over 20 years. Before she stayed home to raise the children, Christine's salary was approximately $25,000 per year. We can infer from the evidence that Jeff's annual salary has

31

approached $400,000 in recent years, because his maintenance payments in 2021 and 2022 have been $126,000, and $121,000, and those amounts have represented 30% of his salary. As noted by the court, Jeff submitted no evidence to show that his ability to pay maintenance has changed. The marital estate, worth approximately $1.75 million, was divided 60/40 in favor of Christine. The court also noted Christine's testimony regarding her reduction of expenses, including moving out of the 5500-square-foot marital residence and into a 1300-square-foot home. As the court acknowledged, Christine had not made efforts to become self-supporting by way of a job. The court explained that, still, any job Christine could realistically obtain would not provide her with an approximation of the lifestyle she had during the marriage. The court reasonably placed great emphasis on this final point and, while considering the other relevant factors set forth in sections 504(a) and 510(a-5), acted within its discretion in denying Jeff's petition to terminate maintenance.

¶ 87                                    III. CONCLUSION

¶ 88        The judgment of the circuit court of Du Page County is affirmed.

¶ 89        Affirmed.